804 F.2d 1487
 55 USLW 2323, 2 UCC Rep.Serv.2d 785
 MORGAN GUARANTY TRUST COMPANY OF NEW YORK, a New York
corporation, Plaintiff- Appellant,
v.
AMERICAN SAVINGS AND LOAN ASSOCIATION, a California
corporation, Defendant- Third Party-Plaintiff-Appellee,
and
The Chase Manhattan Bank, N.A., Third Party Defendant-Appellee.
 No. 85-5817.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 7, 1986.
Decided Nov. 26, 1986.
 
 Richard K. Simon, Kadison, Pfaelzer, Woodard, Quinn, & Rossi, Los Angeles, Cal., for plaintiff-appellant.
 Richard H. Cooper, Freshman, Mulvaney, Marantz, Comsky, Kahan & Deutsch, Beverly Hills, Cal., Roger A. Ferree, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for defendant-third party-plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, NELSON, and HALL, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Morgan Guaranty Trust Company of New York appeals from the district court's grant of summary judgment in favor of American Savings & Loan Association and Chase Manhattan Bank on Morgan's claims for unjust enrichment, money had and received, and conversion. This appeal centers around a question of first impression: whether a holder-in-due-course is entitled to retain funds mistakenly paid to it on notes presented after the holder has knowledge that the maker of the notes has filed a petition for bankruptcy. We hold that it is not so entitled, and reverse in part.
 
 BACKGROUND
 
 2
 The material facts of the case are undisputed. On July 8, 1982, American purchased two Manville Corporation bearer notes due and payable September 2, 1982, at Morgan, each with a face value of $5 million. The notes were held for American by Chase until maturity.
 
 
 3
 On August 26, 1982, Manville filed a Chapter 11 petition in bankruptcy. In response to the filing, Morgan, which held several Manville accounts, instituted special procedures to process Manville notes and checks. American, aware of the bankruptcy, did not anticipate payment of the notes on September 2.
 
 
 4
 On September 2, Chase, acting without instructions from American, presented the notes to Morgan through the New York Clearing House 2:00 a.m. exchange.[1] Morgan effected a provisional settlement of $10 million for the notes at 10:00 a.m. that day. Under Clearing House rules, once the provisional settlement was made, Morgan could revoke it only by taking action before 3:00 p.m. the same day.
 
 
 5
 Morgan processed the notes in accordance with its special procedures for dealing with Manville paper. Unfortunately, the employees in the special channels were unfamiliar with Clearing House procedures. By the time bankruptcy counsel had been consulted and the decision to dishonor the notes was conveyed, it was 4:00 p.m., too late to revoke the settlement.
 
 
 6
 The next day, Chase transferred $10 million credit to American. Morgan demanded repayment of the money, first from Chase, then from American. American refused to return the money.
 
 
 7
 Morgan filed this action against American. American filed a third-party complaint against Chase seeking indemnity if American should be found liable on a promise by Chase, acting as its agent, to return the money to Morgan. American and Morgan filed cross-motions for summary judgment and Chase filed a motion to dismiss for failure to state a claim. American then moved for partial summary judgment on the issues raised in Chase's motion. All motions were presented and heard together.
 
 
 8
 The district court granted American's motion for summary judgment. Morgan Guaranty Trust Co. v. American Savings & Loan Assoc., 605 F.Supp. 1086 (C.D.Cal.1985). The court found Morgan's claims for unjust enrichment, and money had and received, barred by section 3-418 of the New York Uniform Commercial Code. 605 F.Supp. at 1090-93. It found that the action for conversion would not lie because Morgan had not established any legal or equitable right to the money and because there was no specific, identifiable fund capable of being converted. Id. at 1094.[2] Morgan timely appeals.
 
 STANDARD OF REVIEW
 
 9
 We review a grant of summary judgment de novo. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986). Where the facts are undisputed, we confine our inquiry to whether the district court correctly applied the relevant substantive law. See id.
 
 DISCUSSION
 I. Presentment and the Automatic Stay
 
 10
 When Manville filed its petition in bankruptcy, it triggered the automatic stay provisions of 11 U.S.C. Sec. 362(a) (1982).[3] Actions taken in violation of the automatic stay are void. Sambo's Restaurants, Inc. v. Wheeler (In re Sambo's Restaurants, Inc.), 754 F.2d 811, 816 (9th Cir.1985). Subsection 362(a)(6) stays "any act to collect, assess, or recover a claim against the debtor that arose before [the filing of the petition]." Morgan argues that Chase's presentment of the notes was an act to collect a claim against Manville, and therefore violated subsection 362(a)(6), and was void.
 
 
 11
 If the presentment had taken place today, clearly the automatic stay would not void it. 11 U.S.C. Sec. 362(b)(10) (Supp.1984) exempts from the stay the presentment of negotiable instruments. However, subsection 362(b)(10) applies only to cases filed after October 8, 1984, see Pub.L. 98-353, Sec. 553(a) (1984), so it does not govern this case. We must decide whether the automatic stay prohibited presentment prior to that date. We conclude that it did not.
 
 
 12
 Subsection 362(a)(6) uses very broad language and courts generally construe the automatic stay provisions broadly. See, e.g., Coben v. Lebrun (In re Golden Plan of California, Inc.), 37 B.R. 167, 170 (Bankr.E.D.Cal.1984); Wallingford's Fruit House v. Inhabitants of the City of Auburn (In re Wallingford's Fruit House ), 30 B.R. 654, 659 (Bankr.D.Me.1983). However, the language of the other provisions of the automatic stay suggests that mere requests for payment are not barred absent coercion or harassment by the creditor. These provisions stay acts that immediately or potentially threaten the debtor's possession of its property: commencement of judicial proceedings; enforcement of judgments; creation and enforcement of liens; and setoffs of debts owing to the debtor against claims against the debtor. 11 U.S.C. Secs. 362(a)(1), (2), (4), (5), (7) & (8). The activities that are specifically prohibited all involve attempts to confiscate the debtor's property or require the debtor to act affirmatively to protect its interests. Presentment and other requests for payment unaccompanied by coercion or harassment do not appear to fall within the prohibitions of section 362(a).
 
 
 13
 The reasons for the automatic stay also suggest that it does not bar presentment. The statute seeks to ensure orderly administration of the debtor's estate to protect the creditors' right to equality of distribution, see Superior Paint Manufacturing Co. v. Lopez-Soto (In re Lopez-Soto ), 764 F.2d 23, 27 (1st Cir.1985); Holtkamp v. Littlefield (In re Holtkamp ), 669 F.2d 505, 508 (7th Cir.1982); Sen.Rep. No. 989, 95th Cong., 2d Sess. at 49 (1978); reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5835; H.Rep. No. 595, 95th Cong. 1st Sess. at 340 (1977), reprinted in 1978 U.S.Code. Cong. & Ad.News 5787, 6297; see also First National Bank of Anchorage and Alaska Title Guaranty Co. v. Roach (In re Roach ), 660 F.2d 1316, 1318-19 (9th Cir.1981); to provide a breathing spell for the debtor, Roach, 660 F.2d at 1318; H.Rep. No. 595 at 121, reprinted in 1978 U.S.Code Cong. & Ad.News at 6082; and to maintain the status quo, Roach, 660 F.2d at 1319; United States v. Sayres, 43 B.R. 437, 439 (W.D.N.Y.1984); United Mutual Savings Bank v. Doud (In re Doud ), 30 B.R. 731, 734 (Bankr. W.D.Wash.1983). An additional purpose of the stay, to which Congress specifically addressed subsection 362(a)(6), is to prevent harassment of the debtor by sophisticated creditors. Sen.Rep. No. 989 at 50-51, reprinted in 1978 U.S.Code Cong. & Ad. News at 5836-37; H.Rep. No. 595 at 125-26, 342, reprinted in 1978 U.S.Code Cong. & Ad.News at 6086-87, 6298; see Roach, 660 F.2d at 1318; Brown v. Pennsylvania State Employees Credit Union (In re Brown ) 49 B.R. 558, 561 (Bankr.M.D.Penn.1985).
 
 
 14
 Voiding the presentment of notes of a bankrupt maker does not appear to further any of these purposes. The mere act of presentment does not interfere with orderly administration of the estate, the debtor's "breathing spell," or the status quo. Presentment cannot be characterized as harassment, particularly where the creditor presents its notes to the payor bank, rather than to the debtor. See Brown, 49 B.R. at 561 (letter from credit union to debtor violated automatic stay when sent directly to debtor rather than to his attorney). We conclude that the language and purposes of section 362(a) do not bar mere requests for payment unless some element of coercion or harassment is involved.[4] Cf. Roach, 660 F.2d at 1318-19 (bank's notice of postponement of sale of debtor's property specifying new date does not violate automatic stay where bank did not "harass, interfere, or gain any advantage").
 
 
 15
 Our conclusion that presentment did not violate the automatic stay prior to the enactment of subsection 362(b)(10) is buttressed by the legislative history of the subsection. Congress intended the subsection to be a clarifying amendment, not a change in the law.[5] Although such subsequent legislative history is not conclusive, we are entitled to give it weight when the meaning of the statute and original congressional intent are in doubt. Seatrain Ship Building Corp. v. Shell Oil Co., 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980).
 
 
 16
 Morgan points to no cases holding that section 362(a) bars a creditor's request for payment unaccompanied by coercion or harassment. In light of this absence of authority, the language and purposes of the stay provisions, and the subsequent legislative history, we hold that the presentment of the Manville notes did not violate the automatic stay.
 
 II. Restitution Under New York Common Law
 
 17
 Morgan argues that even if presentment of the Manville notes was proper, it has an equitable right to return of the money. American counters that equity does not provide a remedy for Morgan's careless payment and, even if there is a remedy, it has been displaced by the Uniform Commercial Code. We first address the availability of equitable remedies.
 
 
 18
 New York[6] allows actions for unjust enrichment or money had and received to recover money paid by mistake where it would be inequitable for the payee to retain the money. See Paramount Film Distributing Corp. v. State, 30 N.Y.2d 415, 421, 285 N.E.2d 695, 698, 334 N.Y.S.2d 388, 393 (1972), cert. denied, 414 U.S. 829, 94 S.Ct. 57, 38 L.Ed.2d 64 (1973); In re Leland Fox & John Murphy, Inc., 111 A.D.2d 972, 490 N.Y.S.2d 71, 72 (1985). The payor may recover even if it was negligent, Castock Corp. v. Bailey, 128 Misc.2d 1068, 492 N.Y.S.2d 921, 922 (Sup.1985); Citibank v. Warner, 113 Misc.2d 748, 449 N.Y.S.2d 822, 823 (Sup.1981); see McGrath v. Hilding, 41 N.Y.2d 625, 630, 363 N.E.2d 328, 332, 394 N.Y.S.2d 603, 607 (1977) (plaintiff can recover even if guilty of "grievous misconduct" if enrichment sufficiently unjust); unless the payee has changed its position in reliance on the mistaken payment, Castock, 492 N.Y.S.2d at 922; Manufacturers Hanover Trust Co. v. Akpan, 91 Misc.2d 622, 398 N.Y.S.2d 477, 479 (N.Y.City Civ.Ct.1977); see Paramount Film, 30 N.Y.2d at 421, 285 N.E.2d at 698, 334 N.Y.S.2d at 393.
 
 
 19
 New York courts have allowed restitutionary actions for payments "by mistake" in a wide variety of circumstances, some of which appear to involve simple carelessness. See, e.g., Stark v. City of New York, 23 Misc.2d 721, 198 N.Y.S.2d 547, 549 (Sup.1960) (plaintiff paid taxes in mistaken belief he owned lot); Citibank, 113 Misc.2d 748, 449 N.Y.S.2d 822, 823 (bank mistakenly credited funds to wrong account); Manufacturers Trust Co. v. Diamond, 17 Misc.2d 909, 186 N.Y.S.2d 917, 918-19 (Sup.1959) (per curiam) (bank paid check drawn on closed account); Blue Cross of Central New York v. Wheeler, 93 A.D.2d 995, 461 N.Y.S.2d 624, 626 (1983) (insurance company paid on lapsed policy); Allcity Insurance Co. v. Bankers Trust Co., 80 Misc.2d 899, 364 N.Y.S.2d 791, 794 (Alb.Co.Ct.1975) (same). In Manufacturers Trust Co. v. Diamond, the court found it unnecessary to determine the precise factual circumstances surrounding the bank's honoring a check drawn on a closed account; it merely stated that it was "self-evident that but for a mistake the plaintiff would not have paid the check...." 186 N.Y.S.2d at 918. It appears that any unintentional result can be categorized as a "mistake".
 
 
 20
 The case that best demonstrates the breadth that New York courts give the mistaken payment theory of recovery is Valley Bank of Nevada v. Bank of Commerce, 74 Misc.2d 195, 343 N.Y.S.2d 191 (N.Y.City Civ.Ct.1973). In Valley Bank, a forged check drawn on the defendant was deposited with the plaintiff's predecessor-in-interest, the Bank of Las Vegas. After paying the check, the defendant discovered the forgery, and requested repayment from the Bank of Las Vegas. Although the court found that under the U.C.C. the defendant had no right to the money, 343 N.Y.S.2d at 193, Bank of Las Vegas paid. When its depositor refused to reimburse it, Bank of Las Vegas realized its mistake and sued defendant to recover the money. The court held that Bank of Las Vegas could recover whether its error was characterized as a mistake of fact (it may have believed its depositor would not object to being charged with funds to cover the forged check) or a mistake of law (it may have believed defendant had a valid claim). Id. at 194-95. The court stated that because Bank of Las Vegas paid a claim on the basis of a mistake of fact or law and the payee "received a windfall which in fairness it should not be allowed to retain," the court would grant restitution. Id. at 195. We believe that Valley Bank demonstrates that if a bank makes a payment, however carelessly, and the payee has no right to the money, New York courts will order return of the mistaken payment unless the payee has changed its position.
 
 
 21
 Applying New York's unjust enrichment analysis to the case before us, we have no trouble concluding that Morgan has an equitable right to restitution. It is "self-evident" that Morgan made some sort of mistake when it failed timely to dishonor the notes. Whether this error is characterized as mistake of fact or law is irrelevant under New York law. Once Manville filed its petition in bankruptcy, American had no right to receive payment on the notes until the proper disposition of Manville's estate was determined. Because American had no right to the money, Morgan is entitled to restitution unless American changed its position in reliance on the mistaken payment. American has made no showing of changed position, and we do not think it could. It had no reasonable expectation of receiving the money and Morgan notified it of the mistake immediately. We conclude that a New York court would not allow American to retain the $10 million windfall and would provide restitution to Morgan absent a statutory bar.
 
 
 22
 American argues that because Morgan's payment was voluntary, Morgan cannot get equitable relief. See, e.g., Armco, Inc. v. Southern Rock, Inc., 696 F.2d 410, 412 (5th Cir.1983). Demos v. Lyons, 151 N.J.Super. 489, 376 A.2d 1352, 1355 (1977). We disagree. A voluntary payment is one made "by design or intentionally or purposefully or of one's own accord or by the free exercise of the will." Gulf Oil Corp. v. Lone Star Producing Co., 322 F.2d 28, 31 (5th Cir.1963) (quoting Prigmore v. Hardware Mutual Ins. Co., 225 S.W.2d 897, 899 (Tex.Civ.App.1949)). Morgan's failure to dishonor, which came about through careless failure to educate its employees as to deadlines, hardly fits this definition. See Morgan, 605 F.Supp. at 1090 n. 4 (all evidence indicates Morgan's failure to dishonor was "inadvertent"). The payment made in Valley Bank was more nearly "voluntary" than that made by Morgan, yet the New York court awarded restitution.
 
 
 23
 American argues, however, that Morgan should be treated as a volunteer because its mistake was the result of "conscious ignorance." Under the conscious ignorance doctrine, parties that have entered a contract or made payments knowing that they were uncertain of material facts are barred from claiming resulting mistakes as a basis for equitable relief. See Southern National Bank of Houston v. Crateo, Inc., 458 F.2d 688, 693 (5th Cir.1972); Aluminum Company of America v. Essex Group, Inc., 499 F.Supp. 53, 68 (W.D.Penn.1980); Backus v. MacLaury, 278 A.D. 504, 106 N.Y.S.2d 401, 404 (1951); Harley v. Magnolia Petroleum Co., 378 Ill. 19, 37 N.E.2d 760, 765 (1941); Restatement of Contracts 2d Sec. 154, comm. c. For example, a pipe manufacturer that funded repairs on leaky pipes conscious of the fact that it did not know who was responsible for the leaks cannot claim mistake as grounds for restitution when it later discovers the installer was at fault. Armco, 696 F.2d at 412-13.
 
 
 24
 The conscious ignorance doctrine encourages parties to investigate before they act. Equity will not aid someone who deliberately forgoes an opportunity to discover material facts. See Harley, 37 N.E.2d at 765-66; see also In re North Broadway Funding Corp., 34 B.R. 620, 623 (Bankr. E.D.N.Y.1983) (equity should not intrude "to relieve a party from the foreseeable consequences of a conscious course of action."). However, American asks us to bar recovery because Morgan became aware, as the deadline flew by, that it did not know what the deadline was. Morgan never made a conscious decision to proceed in the face of insufficient information. We find the conscious ignorance doctrine inapplicable to this case. Because we find that Morgan would have an equitable remedy under New York law, we must determine whether that remedy has been displaced by the U.C.C.
 
 
 25
 III. Displacement and the Uniform Commercial Code
 
 
 26
 We begin our analysis of the effect of the U.C.C. on Morgan's right to restitution with section 1-103,[7] which the leading commentators on the Code have called its most important provision. J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code 19 (2d ed. 1980) ("Handbook"). Section 1-103 provides:
 
 
 27
 Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.
 
 
 28
 The drafters specifically intended that courts would use equitable principles and section 1-103 to create exceptions to U.C.C. provisions. See Handbook at 19; Summers, General Equitable Principles Under Section 1-10-3 of the Uniform Commercial Code, 72 Nw.U.L.Rev. 906, 941 (1978) ("Principles"). Judges have a duty to consider the equities of a case unless equitable principles have been displaced, Principles at 908, 909, and "nothing short of an express code provision limiting plaintiff's remedy" demonstrates displacement, Hechter v. New York Life Insurance Co., 46 N.Y.2d 34, 39, 385 N.E.2d 551, 554, 412 N.Y.S.2d 812, 815 (1978); see Handbook at 19.
 
 
 29
 American contends, and the district court held, that section 3-418 explicitly displaces Morgan's restitutionary remedy. Section 3-418 provides:
 
 
 30
 Except for recovery of bank payments as provided in the Article on Bank Deposits and Collections (Article 4) and except for liability for breach of warranty on presentment under the preceding section, payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment.
 
 
 31
 Morgan does not contend that American breached a warranty or that any provision of Article 4 gives it a right to restitution. It also concedes that American is a holder in due course. Consequently, our inquiry is whether 3-418 was intended to bar a restitutionary remedy to a payor bank against a holder in due course that had knowledge of the bankruptcy of the maker at the time the instrument was presented. We find nothing in the comments to the section or the case law to suggest that the question was ever considered by the drafters.
 
 
 32
 Section 3-418 was intended to codify the rule of Price v. Neal, 3 Burr. 1354, 97 Eng. Reprint 871 (1762), under which a drawee that accepts or pays an instrument on which the signature of the drawer is forged cannot recover from an innocent payee. Section 3-418, comment 1. The bank was said to be responsible for knowing the authentic signatures of its customers and having the means to compare them with the signature on the instrument. Id.; Marine Midland Bank v. Umber, 96 Misc.2d 835, 410 N.Y.S.2d 25, 27 (Alb.Co.Ct.1978). Another rationale for the rule is to promote finality of transactions: "it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered." Section 3-418, comment 1; Marine Midland, 410 N.Y.S.2d at 27.
 
 
 33
 The provision has been applied in forgery cases, Northern Trust Co. v. Chase Manhattan Bank, 582 F.Supp. 1380, 1386 (S.D.N.Y.), aff'd 748 F.2d 803 (2d Cir.1984) (per curiam); Marine Midland, 410 N.Y.S.2d at 27; Aetna Life & Casualty Co. v. Hampton State Bank, 497 S.W.2d 80, 85-86 (Tex.Civ.App.1973), as well as in cases where instruments were paid despite insufficient funds or stop payment orders, Lowe's of Sanford v. Mid-South Bank & Trust Co., 44 N.C.App. 365, 260 S.E.2d 801, 802-03 (1979); Bryan v. Citizens National Bank in Abilene, 628 S.W.2d 761, 763-64 (Tex.1982). Extension to the latter situations was contemplated by the drafters, and is justified by the same rationales as the Price v. Neal rule: the transactions should be final and the bank should be responsible for knowing the condition of its customers' accounts. See Section 3-418, comment 2. There are two major differences between the case before us and the cases contemplated by the drafters of 3-418. First, American had notice of the problem with the instrument. Second, the problem was bankruptcy of the maker, not forgery, insufficient funds or a stop order.
 
 
 34
 Section 3-418, by imposing liability on the party who best can avoid loss, makes perfect sense as a rule to determine which of two innocent parties should bear the loss. However, if both parties to a transaction know that the payee is not entitled to payment on an instrument, the rationales behind 3-418 are inapplicable. The payee who receives payment aware that he is not entitled to it does not have the same expectation of finality as an innocent payee and the payor bank in this circumstance does not have superior knowledge. A party who accepts payment on an instrument knowing that the payor was entitled to dishonor it justifiably receives less favorable treatment by a court of equity than a payee ignorant of any problem. See Farmers & Merchants Bank v. Universal C.I.T. Credit Corp., 4 Utah 2d 155, 289 P.2d 1045, 1049 (1955) (pre-U.C.C. case approving restitution where payee knows there are insufficient funds to cover check). American points to no cases applying section 3-418 to bar recovery from a payee who had notice that the payor had reason to dishonor the instrument. But see section 3-417, comment 4 (suggesting that, in absence of bad faith, a holder in due course that knowingly presents a forged instrument is entitled to keep money mistakenly paid on it).
 
 
 35
 The second distinguishing factor about this case is that the maker filed a petition in bankruptcy. The district court characterized this as an insufficient funds case. Morgan, 605 F.Supp. at 1088. We disagree. Unlike defendants in insufficient funds cases, who generally have rights against the maker or drawer of the instrument, American had no right to any recovery from Manville until the proper distribution of Manville's estate was determined. The absence of such rights also distinguishes this case from stop payment and forgery cases. The payee of a check subject to a stop order often has a present right to recover against the drawer. If it does not have such a right, the payor bank can assert the drawer's rights and recover the mistaken payment. See section 4-407; Savings Banks Trust Co. v. Federal Reserve Bank, 577 F.Supp. 964, 967 (S.D.N.Y.), aff'd 738 F.2d 573 (2d Cir.1984) (per curiam); Admiral Leather Corp. v. Manchester Modes, Inc., 422 F.Supp. 387, 390 (S.D.N.Y.1976). Forgery cases generally arise between an innocent collecting bank and an innocent payor bank, see, e.g., Northern Trust, 582 F.Supp. 1380, both of whom have a present right to recover from the forger.
 
 
 36
 The fact that the holder of a note of a bankrupt maker has no present right of recovery makes the equitable balance different from that in other section 3-418 cases. A payee with no present right to payment is differently situated than a party who is entitled to money but cannot receive it because of the state of the drawer's account or the unavailability of a culpable forger.
 
 
 37
 In addition, one of the primary goals of the bankruptcy laws is to provide for equality of treatment among creditors. Elliott v. Frontier Properties (In re Lewis W. Shurtleff, Inc.), 778 F.2d 1416, 1420 (9th Cir.1985); England v. Industrial Commission of Utah (In re Visiting Home Services, Inc.), 643 F.2d 1356, 1360 (9th Cir.1981); see Simonson v. Granquist, 369 U.S. 38, 40, 82 S.Ct. 537, 538, 7 L.Ed.2d 557 (1962). Allowing American to retain its windfall, derived solely from Morgan's mistake, puts it in a better position than similarly situated creditors. Although there is no provision of the bankruptcy laws that prohibits American from keeping the money, we would further the goal of equality of treatment by allowing restitution. Our point is not as the dissent would have it, that "This result is required by operation of federal bankruptcy law," but that bankruptcy policy is an additional equitable consideration favoring Morgan's position. Cf. McKnight; 769 F.2d at 662 (awarding restitution to avoid creating preference in favor of defendants over other creditors).
 
 
 38
 We conclude that 3-418 does not displace a restitutionary action by a payor bank for recovery of a mistaken payment to a payee with knowledge of the bankruptcy of the maker of the instrument in question. Met Frozen Food v. Nat'l Bank of America, 89 Misc.2d 1033, 393 N.Y.S.2d 643 (1977), cited by the dissent is not inconsistent with our holding. In Met, there were no allegations either that plaintiff was not entitled to receive payment at the time the bank attempted to dishonor the checks or that plaintiff knew that the checks should be dishonored. Moreover, the bank's reason for dishonoring the checks was not the bankruptcy of the depositor; the bankruptcy took place after the bank attempted to dishonor the checks. See 393 N.Y.S.2d at 646, 648. Nor is there any indication in the case that the bank knew of the impending bankruptcy when it attempted to dishonor.[8] The fact that American is a holder in due course adds to the equitable balance on its side, but, on balance, does not overcome the equities in Morgan's favor.
 
 
 39
 In cases closely analogous to the one at bar, defendants have been allowed recovery of mistaken payments. When a payee discovers before presenting an instrument that its maker has died, he becomes a general creditor of the estate of the deceased and has no right to payment until the proper disposition of assets has been determined. Bank Leumi Trust Co. of New York v. Bally's Park Place, Inc., 528 F.Supp. 349, 354 (S.D.N.Y.1981). The only case applying 3-418 in the context of the death of the maker found that 3-418 did not bar recovery of a mistaken payment from a payee with knowledge. Id. at 354. Similarly, holders of cashier's checks drawn on an insolvent bank become creditors of the bank and can receive payment only in compliance with the National Bank Act. FDIC v. McKnight, 769 F.2d 658, 661 (10th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986). When an insolvent bank's receiver mistakenly honored cashier's checks, the Tenth Circuit held 3-418 inapplicable and ordered restitution. Id. Though these cases are not controlling,[9] they support our conclusion that 3-418 does not bar restitution when the payee has actual knowledge that it has no present right to receive payment. See Bank Leumi, 528 F.Supp. at 355 ("the burden of pursuing the estate of the maker should fall on the depositor of a check known to be worthless, rather than the drawee-bank guilty of computer-induced negligence in failing to protest the check in timely fashion.").
 
 
 40
 American argues that the warranty provisions of section 3-417 demonstrate that the drafters of the code explicitly displaced a restitutionary remedy against a payee with knowledge of bankruptcy. The 3-417 warranties are a major exception to the final payment rule of 3-418. Under 3-417(2)(e), when a party transfers an instrument for value, it warrants that it has no knowledge of insolvency proceedings instituted with respect to the maker. By contrast, the presentor of an instrument makes no such warranty. See section 3-417(1). American concludes from section 3-417 that the drafters, by not requiring a payee to warrant lack of knowledge of insolvency proceedings to a payor bank, made a deliberate decision to place the risk of loss from payments mistakenly made despite insolvency on the payor bank. Thus, it argues, a payee's knowledge of insolvency proceedings cannot form the basis of an equitable action. We read section 3-417 differently. Section 3-511(3)(a) provides that a payee with knowledge of the insolvency of the maker of an instrument need not present the instrument to preserve the rights that ordinarily are lost if timely presentment is not made. Section 3-511(3)(a) and comment 6. If the payee has knowledge of the bankruptcy, normally it will not present the instrument. The drafters had no reason to anticipate that the situation in this case would arise. On the other hand, there is no reason for the holder of a note of an insolvent maker not to transfer the instrument. For the protection of the transferee, the holder, who generally is in a better position to know of any insolvency proceedings, must warrant that it is not aware of them when it transfers the note. See section 3-417 comment 10. We conclude that the different treatment accorded to payor banks and transferees by section 3-417 was designed to protect transferees, not to assign the risk of loss in a situation the drafters had no reason to anticipate. Consequently, we remain unconvinced that the drafters specifically considered the effect of 3-418 on a payee with knowledge of bankruptcy.
 
 
 41
 American also contends that carving out "judicial exceptions" to the final payment rule of section 3-418 will "have a chilling effect upon the transferability and fluidity of commercial paper." This argument ignores section 1-103, which mandates equitable exceptions to the Code, and fails to recognize the narrowness of our holding. The case we decide today apparently has not arisen before and we think it unlikely that it will recur often enough to undermine seriously the operation of the nation's financial markets. The dissent similarly argues that our opinion will undermine the finality of commercial transactions. Contrary to the dissent's views, courts could not engage in this kind of analysis in every case to reach results they find "equitable". The vast majority of cases that implicate section 3-418 involve forgeries, insufficient funds or stop payment orders. They understandably are governed by the final payment rule. We believe that individual consideration under section 1-103 of the rare cases that involve situations apparently not contemplated by the drafters is merited and will not undermine the basic operation of section 3-418 or render "the Rules of the New York Clearing House mere verbiage."
 
 
 42
 American also argues that the delay provision of the Code, section 4-108, bars a restitutionary action by Morgan. The applicable portion of the provision, section 4-108(2), provides,
 
 
 43
 Delay by a collecting bank or payor bank beyond time limits prescribed or permitted by this Act or by instructions is excused if caused by interruption of communication facilities, suspension of payments by another bank, war, emergency conditions or other circumstances beyond the control of the bank provided it exercises such diligence as the circumstances require.
 
 
 44
 The provision is applicable to delays in processing items governed by clearing house rules. Section 4-108 comment 4.
 
 
 45
 American alleges that the delay in dishonoring the Manville notes was not caused by circumstances beyond Morgan's control and that Morgan did not exercise the diligence required by the situation. It claims that section 4-108 operates as the only means to excuse delay, and since its terms are not met, Morgan is liable for failure to dishonor the notes on time. We disagree.
 
 
 46
 Section 4-108(2) on its face expands, rather than limits, the ability of payor banks to avoid liability by payments caused by unintentional failure to dishonor. It says that "delay is excused if caused by" then listed occurrences, not that delay is only excused by them. Comment 4 to the section says "when delay is sought to be excused under this subsection the bank must 'exercise such diligence as the circumstances require' and it has the burden of proof." Section 4-108, comment 4 (emphasis added). This language persuades us that a payor can excuse delay in other ways. Nothing in the language of the statute, the comments to it, or the cases cited by American suggests that 4-108 was intended to displace equitable remedies preserved elsewhere in the Code.
 
 
 47
 American cites Union Bank of Benton v. First National Bank, 621 F.2d 790, 795 (5th Cir.1980), for the proposition that in the absence of an excuse for late return, the payor bank is held strictly liable for the item. Union Bank involved the deadlines set by section 4-302. Id. Courts have universally held that payor banks are strictly liable for violation of 4-302 deadlines. See State & Savings Bank of Monticello v. Meeker, 469 N.E.2d 55, 58 (Ind.App.1984) (collecting cases). However, section 4-302 does not apply to this case.[10] The relevant deadlines come from clearing house rules and section 4-213.[11]
 
 
 48
 Courts are divided on the effect of finality of payment under section 4-213. Some courts have held that once a payment is final under the provision, the payor is liable to the presentor for the face value of the instrument and has no possible equitable action for return of money paid by mistake. See, e.g., Ashford Bank v. Capital Preservation Fund, Inc., 544 F.Supp. 26, 29 (D.Mont.1982). This view is flawed in that it ignores the fact that section 3-418 clearly was intended to leave unjust enrichment actions available in some situations. Other courts have found that finality under 4-213 has no independent substantive effect, but merely determines when section 3-418 comes into play. See National Savings and Trust Co. v. Park Corp., 722 F.2d 1303, 1306 (6th Cir.1983), cert. denied, 466 U.S. 939, 104 S.Ct. 1916, 80 L.Ed.2d 464 (1984); Demos, 376 A.2d at 1356-57. We think this is the better view. There is no evidence that section 4-213 was intended to displace the principles of restitution for mistaken payments that survive section 3-418. See Demos, 376 A.2d at 1357.
 
 
 49
 At no point does any comment to section 4-213 mention the effect this section is supposed to have on the restitutionary rights of banks. Thus, it seems evident that the drafters of the Code never intended for section 4-213 to supercede section 3-418, and we can see no reason to adopt a position contrary to that intent.
 
 
 50
 National Savings, 722 F.2d at 1306. The New York cases relied on by the dissent simply do not address the relationship between sections 4-213 and 3-418.
 
 
 51
 Section 4-301, relied on by the dissent, is inapplicable to this case. That section applies, by its terms, only to demand items; the note at issue here was not a demand item.
 
 
 52
 We conclude that sections 3-418, 4-108 and 4-213 do not displace Morgan's equitable remedy for payment by mistake.[12] We reverse the district court's grant of summary judgment for American and remand to allow the court to enter judgment for Morgan on its claims for unjust enrichment and money had and received.
 
 IV. Conversion and Punitive Damages
 
 53
 Because we have granted Morgan relief for unjust enrichment and money had and received, the remaining conversion claim would be superfluous in the absence of Morgan's request for punitive damages based on that claim. The parties disagree on whether New York or California law applies and on whether Morgan can state a claim for conversion of money that was received through the netting of electronic fund transfers.[13] We need not decide these issues, however, because we find that punitive damages would be inappropriate under either New York or California law.
 
 
 54
 Punitive damages must be based on a showing of conscious disregard for the rights of others or some type of evil motive or other morally culpable conduct. See Welch v. Mr. Christmas, Inc., 57 N.Y.2d 143, 150, 440 N.E.2d 1317, 1321, 454 N.Y.S.2d 971, 975 (1982); Garrity v. Lyle Stuart, Inc., 40 N.Y.2d 354, 358, 353 N.E.2d 793, 795, 386 N.Y.S.2d 831, 833 (1976); Borkowski v. Borkowski, 39 N.Y.2d 982, 355 N.E.2d 287, 387 N.Y.S.2d 233 (1976); Cal.Civ.Code Sec. 3294 (West 1970); Hasson v. Ford Motor Co., 32 Cal.3d 388, 402, 650 P.2d 1171, 1179-80, 185 Cal.Rptr. 654, 662-63 (1982), cert. dismissed, 459 U.S. 1190, 103 S.Ct. 1167, 75 L.Ed.2d 422 (1983); Colonial Life & Accident Insurance Co. v. Superior Court, 31 Cal.3d 785, 792, 647 P.2d 86, 90, 183 Cal.Rptr. 810, 814 (1982). American retained the $10 million in this case under a tenable claim of right strong enough to convince the district court. Although we reverse, we acknowledge that this is a close case and that the key issue is one of first impression. Punitive damages are inappropriate in this case. See Hollender v. Trump Village Cooperative, 97 A.D.2d 812, 468 N.Y.S.2d 683, 685 (1983) (punitive damages inappropriate where no showing of moral culpability or evil motive); Fox v. Aced, 49 Cal.2d 381, 317 P.2d 608, 610 (1957) (punitive damages not recoverable against party who acts in good faith under advice of counsel). In the absence of a viable claim for punitive damages, Morgan's conversion claim is superfluous and we need not address it.
 
 CONCLUSION
 
 55
 We reverse the district court's grant of summary judgment in favor of American, and remand with instructions to enter summary judgment for Morgan on its claims for unjust enrichment and money had and received. American's third party complaint against Chase was premised on American being held liable as the result of promises made by Chase to Morgan. Because we find American liable due to its own unjust retention of funds mistakenly paid to it, we affirm the district court's dismissal of American's claim against Chase.
 
 
 56
 AFFIRMED in part, REVERSED and REMANDED in part.
 
 
 57
 CYNTHIA HOLCOMB HALL, Circuit Judge, dissenting:
 
 
 58
 Today a majority of the panel holds that a bank which fails to dishonor notes by the deadline established by the local clearing house rule and which makes payment on the notes to a holder in due course may recover those payments in cases when the Uniform Commercial Code does not specifically refer to the fact situation involved and when a court determines that it is "equitable" to grant relief. I believe that the Code was intended to provide more concrete guidance for those engaging in commercial paper transactions.
 
 
 59
 I agree that section 1-103 of the Code provides the background for interpreting other Code provisions and I agree that the equitable principles embodied in that section govern transactions unless displaced. The majority's definition of "displacement," however, basically forges a rule that allows courts to disregard Code provisions in the pursuit of their view of equity whenever the letter of the Code leads to a result they view as unpalatable. The majority states the purposes behind the final payment rule of section 3-418 and then engages in a long discourse of how the peculiar and myriad facts of this case weaken or distinguish the policies behind the rule. I have no doubt that courts could engage in this kind of analysis in every case to reach results they find "equitable." The ultimate result of this process, however, is an unfortunate uncertainty in commercial transactions, an uncertainty that the Code was designed to avoid.
 
 
 60
 Broad rules intended to guide a large number of commercial transactions reflect policy judgments. Often those judgments require what may seem to be harsh results in individual cases in order to achieve a greater policy objective along with a certainty in law which allows all to conform their conduct to the requirements of the rule. The final payment rule of section 3-418 is no different. This rule is intended to provide for finality in commercial paper transactions so that the integrity of those transactions can be maintained. See 6 R. Anderson, Uniform Commercial Code Sec. 3-418:4, at 412 (3d ed. 1984) (footnote omitted) ("UCC Sec. 3-418 is predicated upon the need for finality and not upon any outdated concept that the drawee bank can carefully examine checks for forgery."). This policy, and not any factual permutations that might have been considered by the Code's drafters, designates the point at which notions of equity are supplanted.
 
 
 61
 The majority believes that, because American knew that Morgan had the right to dishonor the notes, American had a reduced expectation of finality and, as a result, section 3-418 does not apply. I find no indication that the goal of finality to which section 3-418 is directed is at all linked to any expectations of finality of a party to the transaction. The principle is inextricably linked to the expectations not only of the instant parties but to the millions of future parties whose conduct must conform to section 3-418 and who must know its limits to conform to its guidelines. The majority may feel that it has made a small, limited incursion into section 3-418's domain. Other parties will be left to wonder whether this case is a one-way ticket good for this day and this day only or an indication of other future "limited" incursions.
 
 
 62
 Sections 3-418 and 4-213 make clear that courts should make no incursion at all. Comment 5 to section 3-418 states (emphasis added):
 
 
 63
 [The final payment rule] is ... limited by the bank collection provision (Section 4-301) permitting a payor bank to recover a payment improperly paid if it returns the item or sends notice of dishonor within the limited time provided in that section.[1] But notice that the latter right is sharply limited in time, and terminates in any case when the bank has made final payment, as defined in Section 4-213.
 
 
 64
 Section 4-213 of the Code specifies the time at which the right to revoke payment expires. That rule provides (emphasis added):
 
 
 65
 (1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:
 
 
 66
 (a) paid the item in cash; or
 
 
 67
 (b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or
 
 
 68
 ....
 
 
 69
 ....
 
 
 70
 (d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.
 
 
 71
 The equitable principles of section 1-103 have their place in commercial paper transactions, but those equitable rights expire when the clearing house deadline expires. The Code provided Morgan with a right to recover any money it paid before the deadline so long as the revocation of payment occurred within the time allowed by the clearing house rules. Unfortunately, the provisional settlement in American's favor became final when the deadline passed.
 
 
 72
 Any other result renders the language of section 4-213 meaningless. When sections 4-213(1)(b) and (d) speak of revocation, we must assume that they refer to revocation for legitimate reasons, and Morgan certainly had a legitimate reason for revoking any provisional settlement in American's favor. Morgan had every right to refuse to pay on the note. But even legitimate efforts to revoke have their time limitations, as the plain language of section 4-213 makes apparent. After that time has passed, the policy favoring finality cuts off the equitable rights in order to further the goal of repose. See Perini Corp. v. First National Bank, 553 F.2d 398, 405-06 (5th Cir.1977).
 
 
 73
 The majority states that it believes the interaction of sections 3-418 and 4-213 can be viewed in either of two ways and that it favors the view that section 4-213 does not extinguish restitutionary rights. Ante at 1499 (citing National Savings and Trust Co. v. Park Corp., 722 F.2d 1303, 1306 (6th Cir.1983), cert. denied, 466 U.S. 939, 104 S.Ct. 1916, 80 L.Ed.2d 464 (1984)). Neither I nor the courts of New York, whose law we are bound to apply, think that the majority's view of section 4-213 is the better view. A bank that fails "to dishonor the check before the deadline provided by the Uniform Commercial Code and the Rules of the New York Clearing House" may not recover its payment. Fromer Distributors, Inc. v. Bankers Trust Co., 37 A.D.2d 840, 321 N.Y.S.2d 428, 430 (Sup.Ct.1971) (citing U.C.C. Secs. 4-211, 4-213, & 4-301). That payment is final. 321 N.Y.S.2d at 430. See Manufacturers & Traders Trust Co. v. County Trust Region of the Bank, 59 A.D.2d 645, 398 N.Y.S. 298, 298 (Sup.Ct.1977) (citing U.C.C. Secs. 4-301 & 4-302). Cf. Security Trust Co. v. First National Bank, 79 Misc.2d 523, 358 N.Y.S.2d 943, 945, 947 (Sup.Ct.1974) (defendant bank not liable on checks since return was timely pursuant to the clearing house rules and proper notice was given under Code).
 
 
 74
 In Met Frozen Food Corp. v. National Bank of North America, 89 Misc.2d 1033, 393 N.Y.S.2d 643 (Sup.Ct.1977), the court explained the difficult policy decisions accompanying the burdens placed upon payor banks. The requirement that payor banks comply with clearing house rules or face liability for the amount of the notes places those banks in a "precarious position." 393 N.Y.S.2d at 647. The payor bank "must act and act quickly under rather hectic conditions to protect itself against incurring substantial liabilities. However, the integrity of the entire system of commercial paper itself requires that someone bear a risk. The UCC has quite logically placed the risk upon the obvious party [the payor bank]." Id.[2] Because of the role of the payor bank in the collection process, " '[t]he legislature could have considered that the failure of such a bank to meet its deadline is likely to be due to factors other than negligence, and that the relationship between a payor bank and its customer may so influence its conduct as to cause a conscious disregard of its statutory duty.' " Id. at 647-48 (quoting Rock Island Auction Sales v. Empire Packing Co., 32 Ill.2d 269, 273, 204 N.E.2d 721, 723 (1965)).
 
 
 75
 Finally, the court in Met Frozen Food stated the well-established rule of New York law, that a failure to revoke before the clearing house deadline is, in effect, final payment of the item. 393 N.Y.S.2d at 647. This rule held true even though the bank's reasons for attempting to dishonor the notes included the bankruptcy of its depositor. Id. at 648.[3]
 
 
 76
 The Code and its equitable principles demonstrate some sympathy for those payors who make payment on notes they are entitled to dishonor. But that sympathy goes only so far. After the grace period for recovery of mistaken payments has passed and after the time for dishonor under the clearing house rules has lapsed, the goal of finality, if it is to mean anything at all, must take priority. The majority's rule raises the possibility that a payor may be entitled to recover a mistaken payment months after payment is made. That possibility creates an uncertainty which undermines the goal of finality in commercial paper transactions. The principle of finality, if it is to be achieved, cannot tolerate such results. Further, the majority's rule has the effect of rendering the Rules of the New York Clearing House mere verbiage.[4]
 
 
 77
 The court in Met Frozen Food recognized the significance of destabilizing commercial paper exchanges by weakening the rule of repose.
 
 
 78
 $14,835,917,339,000 [is] an impressive amount, even in an age of superlatives. It represents the total dollar value of commercial paper cleared through the sixteen Federal Reserve Banks in the major cities of the United States during the 1975 calendar year. In New York City alone, the average daily exchange at the New York Clearing House amounts to $5,642,306,382.51. Each day, then, more than five billion dollars changes hands in the metropolitan area by means of abstract transactions involving bank debits and credits. ... [I]n a functional economy paper is king.
 
 
 79
 This fluidity of exchange is made possible by the country's "banking system." It provides the machinery and the personnel which makes the transfer of funds possible and workable.
 
 
 80
 393 N.Y.S.2d at 644-45.
 
 
 81
 There are some areas in which "undefined considerations of equity" have no place. See Butner v. United States, 440 U.S. 48, 56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). The final payment rule is one of those areas. If I take any solace at all from the decision in this case, it is that our rule does not bind the courts of New York which have clearly marked out a better path to follow.
 
 
 82
 I dissent.
 
 
 
 [1]
 At that time, there was less than $2 million in available funds in Manville's accounts at Morgan
 
 
 [2]
 Because of its decisions on the summary judgment motions, the court dismissed American's third-party claim against Chase and dismissed Chase's motion as moot. 605 F.Supp. at 1094
 
 
 [3]
 The bankruptcy court issued an order applying the provisions of section 362(a) to Manville and its property. We assume, since it used the same language, that the court intended the scope of the stay to be identical to the statutory provisions
 
 
 [4]
 The case law supports a distinction between communications between the creditor and debtor that contain threats or harassment and those that merely set forth the fact that money is owing. Thus, courts have held the automatic stay violated by letters giving notice of intent to terminate a lease, Southside Leasing Co. v. Merchant's Plaza, Inc. (In re Merchant's Plaza, Inc.), 35 B.R. 888, 893-94 (Bankr.D.Tenn.1983); see A. Dan Chisolm, Inc. v. B.P. Oil, Inc., Gulf Products Division (In re A. Dan Chisolm, Inc.), 57 B.R. 718, 720 (Bankr.M.D.Fla.1986) (notice of intent to terminate franchise may violate stay); by a letter informing the debtor that a creditor medical clinic would provide no future medical services due to his refusal to pay, Olson v. McFarland Clinic (In re Olson ) 38 B.R. 515, 517-18 (Bankr.N.D.Iowa 1984), by a letter from an attorney informing the debtor he had been retained by a creditor to collect a delinquent account, DeLay v. Underwood (In re DeLay ), 25 B.R. 898, 901 (Bankr.W.D.Mo.1982) modified on other grounds, 48 B.R. 282 (W.D.Mo.1984); by a college that refused to give transcripts to the debtor to force payment, Parraway v. Andrews University, 50 B.R. 316, 319 (W.D.Mich.1984) (collecting cases), and by a creditor who made repeated visits and telephone calls to the debtor. In re Gibson, 16 B.R. 682, 683-84 (Bankr.S.D.Ohio 1981). On the other hand, a court has said that a letter from a credit union announcing it would do no further business with the debtor unless the debt was reaffirmed would not have violated the automatic stay if it had been sent to the debtor's attorney, Brown, 49 B.R. at 561, and we have treated other communications that merely set forth the fact of the debt as amendable proofs of claim not voided by the automatic stay, see Sambo's Restaurants, 754 F.2d at 816; County of Napa v. Franciscan Vineyards, Inc. (In re Franciscan Vineyards, Inc.) 597 F.2d 181, 182-83 (9th Cir.1979) (per curiam), cert. denied, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 598 (1980)
 
 
 [5]
 In 1980, the language of subsection 362(b)(10) was first introduced as part of a bill "to correct technical errors, clarify and make minor substantive changes" to the Bankruptcy Reform Act of 1978. See H.Rep. No. 1195, 96th Cong.2d Sess. 1 (1980). The House Judiciary Committee called the provision "a confirming amendment to make clear that the automatic stay is not intended to interfere with the rights of a holder of a negotiable instrument to obtain payment." Id. at 11. Though the 1980 bill was never enacted, each chamber passed its own version of the bill including the presentment provision, and the limited record of discussion indicates no controversy about the provision. See 126 Cong.Rec. 26,485 et seq. (House version of bill and discussion), 31,139 et seq. (Senate version of bill and discussion) (1980). When the provision was adopted in 1984, Congress used identical language. We think that this legislative history gives some indication that, as early as 1980, Congress did not intend the automatic stay to affect presentment of negotiable instruments. See Montana Wilderness Association v. U.S. Forest Service, 655 F.2d 951, 957 (9th Cir.1981) (subsequent conference report entitled to significant weight), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)
 
 
 [6]
 The parties agree that New York law applies to the claims for unjust enrichment and money had and received
 
 
 [7]
 All statutory citations in this section refer to the U.C.C. For clarity, we use the U.C.C. numbering system when referring to provisions of the N.Y.U.C.C. or the Code as enacted in other jurisdictions
 
 
 [8]
 Counsel's argument addressed by the court in Met Frozen Foods noted in footnote 3 of the dissent was directed to an entirely different issue. Defendant bank in that case argued that plaintiffs had not been damaged by its failure timely to dishonor because if the money had been paid, it would have to have been returned as a voidable preference due to the subsequent bankruptcy. See 393 N.Y.S.2d at 648. Defendants did not argue either that the plaintiffs had no right to payment at the time of dishonor or that plaintiffs knew of the impending bankruptcy at the time the checks were presented. The court correctly determined that it was not the proper forum for determining the rights of the parties that arose from the subsequent bankruptcy, id., but did not address the equitable arguments at issue in this case
 
 
 [9]
 Bank Leumi expressly stated that it did not involve holders in due course. 528 F.Supp. at 350 n. 1. Furthermore, the court emphasized that the defendant should have known that the check it deposited was in a form that could give problems to the payor bank. Id. at 353. Thus, the case can be viewed as turning on the bad faith of the defendant. See F. Miller & A. Howell, The Law of Modern Payment Systems and Notes 221 n. 51 (1985)
 In McKnight, the court also found that the checks were converted from negotiable instruments to deposits by operation of law at the moment of insolvency. 769 F.2d at 661; see 12 U.S.C. Sec. 1813(l )(4) (1982). McKnight also obviously involves a different statutory scheme than the bankruptcy laws.
 
 
 [10]
 Section 4-302(a) applies to demand items; the Manville notes were not demand items, but rather payable on a specific date. Section 4-302(b) applies to "properly payable items." The notes were not properly payable because Manville funds were not available for payment at the time Morgan had to decide whether to honor them. Section 4-104(1)(i)
 
 
 [11]
 Section 4-213 provides in pertinent part,
 An item is finally paid by a payor bank when the bank has done any of the following
 * * *
 (d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by the statute, clearing house rule or agreement.
 Upon a final payment under subparagraphs (b), (c) or (d) the payor bank shall be accountable for the amount of the item.
 
 
 [12]
 American also argues that Morgan "accepted" the Manville notes by signing them, and thereby agreed to be primarily liable. See section 3-410. However, it is apparent from the face of the notes that this claim must fail. Printed on the notes above the signature of Morgan's authorized agent is a statement which reads,
 PAYABLE AT Morgan Guaranty Trust Company
 
 
 [23]
 Wall Street
 New York, N.Y. 10015
 NOT VALID UNLESS COUNTERSIGNED BY MORGAN GUARANTY TRUST COMPANY OF NEW YORK AS ISSUING AGENT.
 This makes clear that the purpose of the signature was to verify the notes, not to assume liability for them. American relies on Dziurak v. Chase Manhattan Bank, 58 A.D.2d 103, 396 N.Y.S.2d 414, 416 (1977), aff'd 44 N.Y.2d 776, 377 N.E.2d 474, 406 N.Y.S.2d 30 (1978), for the proposition that a bank's signature can have two purposes. American argues that Morgan's signature on the notes was both as acceptor and drawee. Dziurak, however, involved a cashier's check, an instrument which by definition is accepted upon issuance. 396 N.Y.S.2d at 415-16. A bank's signature on such an instrument necessarily is serving two purposes. Dziurak does not support construing a signature potentially made as an issuing agent as an acceptance.
 
 
 [13]
 Although the parties acknowledge that only specifically identifiable money can be the subject of a conversion action, see Peters Griffin Woodward, Inc. v. WCSC, Inc., 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (1982); Weiss v. Marcus, 51 Cal.App.3d 590, 599, 124 Cal.Rptr. 297, 303 (1975), it is unclear how this standard would apply to the case at bar. Compare Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 732 F.2d 859, 862-63 (11th Cir.1984) with Northern Trust Co. v. Chase Manhattan Bank, 582 F.Supp. 1380, 1386 (S.D.N.Y.), aff'd, 748 F.2d 803 (2d Cir.1984) (per curiam)
 
 
 [1]
 U.C.C. Sec. 4-301 provides:
 (1) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (subsection (1) of Section 4-213) and before its midnight deadline it
 (a) returns the item; or
 (b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.
 ....
 (3) Unless previous notice of dishonor has been sent an item is dishonored at the time when for purposes of dishonor it is returned or notice sent in accordance with this section.
 (4) An item is returned:
 (a) as to an item received through a clearing house, when it is delivered to the presenting or last collecting bank or to the clearing house or is sent or delivered in accordance with its rules....
 Comment 5 to section 4-301 states that if the item has been "finally paid" under section 4-213 (1), then section 4-301 "has no operation."
 
 
 [2]
 The majority argues that Met Frozen Food is consistent with its holding. Ante at 1496-97. The plain language of the New York court's opinion rebuts this contention:
 It is clear that if the plaintiffs can establish that [the payor bank] failed to timely return a check .. within the deadline set forth in [the Code] ... [the payor bank] is liable for the face amount of the item ... less any payment received (see UCC Sec. 4-213 ).
 
 
 [393]
 N.Y.S.2d at 647 (emphasis added) (citing Sunshine v. Bankers Trust Co., 34 N.Y.2d 404, 358 N.Y.S.2d 113, 314 N.E.2d 860 (1974); Fromer Distributors, 321 N.Y.S.2d 428; Rock Island Auction Sales v. Empire Packing Co., 32 Ill.2d 269, 273, 204 N.E.2d 721, 723 (1965); United States v. Loskocinski, 403 F.Supp. 75 (E.D.N.Y.1975))
 
 
 [3]
 The majority implies that the payor bank in Met Frozen Food did not argue that the bankruptcy of the depositor precluded liability. Ante at 1497 & n. 8. Again, the language of the New York court's opinion reveals the majority's error:
 In a rather intriguing argument ... defendant contends that plaintiffs cannot establish [liability]. It argues that due to the short period of time between dishonor [of the checks] and [the depositor's] bankruptcy, plaintiffs would have been unable, assuming a timely return, to retain the monies received since payment would represent a voidable preference.... However, here, since defendant was a payor bank its obligations were prescribed by [the Code], which, as previously noted, requires return to be made within a specified time....
 The issue of whether payment by defendant of the checks in question would result in plaintiffs' [sic] obtaining a preference over [the depositor's] other creditors is not properly before this Court. It has not been established that the defendant is a creditor ... nor are these actions the appropriate forum [sic] for making such a determination. That issue may be relevant if and when a recovery is obtained.
 
 
 [393]
 N.Y.S.2d at 648 (emphasis added). The fact that the bankruptcy occurred after the bank attempted to dishonor the checks in no way alters the analysis. Nor does the majority's assumption that the bank lacked knowledge of the impending bankruptcy. In fact, if the bank in Met Frozen Food was unaware of the impending bankruptcy of its depositor, it would have had an even stronger case on the "equities." In any event, the New York court found the bankruptcy immaterial to the issues before it
 
 
 [4]
 I take issue with any implication in the majority opinion that its result is required by operation of federal bankruptcy law. Much is made of the point that if American is allowed to retain the money it will somehow receive favored treatment vis-a-vis other creditors of Manville. First, I believe this argument simply begs the question of who is Manville's creditor. American has received no money from the bankruptcy estate. What has happened in this case, in essence, is that Morgan has purchased American's claim against Manville. Thus, it is Morgan--not American--that is Manville's creditor. Cf. note 3 supra
 Second, when we have referred to the bankruptcy policy that creditors share equally, we have meant that creditors in the same class or those possessing the same nonbankruptcy entitlements should share equally. But the initial step in this inquiry is to determine the nonbankruptcy entitlements of the creditors. See Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); Ohio v. Kovacs, 469 U.S. 274, 285, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985) (O'Connor, J., concurring); In re Anchorage International Inn, 718 F.2d 1446, passim (9th Cir.1983). I believe that American's nonbankruptcy entitlements are greater than those of other unsecured creditors. Because American's nonbankruptcy rights entitle it to full payment, American should be entitled to full payment in bankruptcy.
 Finally, no creditor of the debtor is placed in a worse position in order to benefit any other creditor. Because there has been no distribution from estate assets, no unsecured creditor faces a diminished recovery. One creditor has simply been substituted for another. And the size of Morgan's claim against the estate will be of a size equal to that American would have had absent Morgan's mistaken payment. Thus, I see no reason to alter the state law result in this case simply because the maker of the note happens to be in bankruptcy. Although Congress has the authority to upset state law substantive rights, "Congress has not done so." In re Anchorage International Inn, 718 F.2d at 1451.