### In re William L. BOBBITT and Olga McVay, Debtors.

### Bankruptcy No. 91–53158–ASW–OR.

United States Bankruptcy Court, N.D. California.

Sept. 30, 1993.

**550**

James M. Lauderdale (argued), Law Office of James M. Lauderdale, Monterey, CA, for debtors.

Eric M. North (argued), The North Law Firm, San Jose, CA, for Monterey Federal Credit Union.

## DECISION ON DEBTORS' MOTION FOR SANCTIONS

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

This matter came before the Court for trial on the motion [1] filed by Debtors William L. Bobbitt ("Bobbitt") and Olga McVay ("McVay") (collectively "Debtors") for sanctions against the Monterey Federal Credit Union ("MFCU") for violation of the automatic stay imposed by § 362,[2] and for violation of the § 525[3] antidiscrimination provisions of the Bankruptcy Code.

## I. BACKGROUND

Debtors filed their Chapter 13 joint petition on May 24, 1991. At the time of the filing, Debtors were employed at the Defense Language Institute ("DLI") and were members of the MFCU where they maintained a savings account and a checking account. Debtors also maintained a "checkline" account with MFCU, which was essentially a check overdraft account. At the time the bankruptcy petition was filed, the checkline had an outstanding balance in the amount of $479.83.

Upon learning of the Debtors' bankruptcy petition and reviewing their Chapter 13 plan, MFCU determined that Debtors would not be repaying the checkline account in full and that MFCU would suffer a loss as a result of Debtors' bankruptcy. Consequently and pursuant to credit union policy, MFCU cancelled without notice a number of services that had previously been available to the Debtors. These services included: sending periodic account statements, use of automatic teller machine ("ATM") privileges, and negotiating personal checks. Debtors allege that MFCU's actions violate the antidiscrimination provisions of § 525 and the automatic stay provision of § 362. Debtors contend MFCU terminated these services and refused McVay's cash withdrawal request in order to harass them to compel payment on their prepetition debt. They further contend that termination was improper without MFCU first obtaining relief from the automatic stay.

MFCU contends that, pursuant to credit union policy, any MFCU member who causes a loss to the credit union will have those services that could potentially cause further loss to MFCU withdrawn. ATM privileges are suspended because it is possible to withdraw more money from an account than is on deposit. MFCU will not negotiate a member's personal checks drawn on other banks

---

1. Similar motions were filed by counsel for these Debtors in two other Chapter 13 cases. These motions are trailing the resolution of the motion in this case. Those cases are *Nina Wright* (Case No. 590–00070 ASWOR) and *James and Norma Saylor* (Case No. 587–04192 ASWOR). Debtors' counsel also filed an adversary case (Adv. No. 92–5327) on behalf of another Chapter 13 debtor, *Todd Burns*, concerning the policies that are the subject of this motion for sanctions. That adversary is also trailing this proceeding.

2. Unless otherwise specified, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, and references to Bankruptcy Rules are to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

3. MFCU has not objected in this case to the Debtors' raising their § 525 claims by *motion* as opposed to *adversary complaint*. The Court will, therefore, decide the merits without determining whether this is proper procedurally.

because of the risk that the check may be drawn on insufficient funds. Finally, although account statements do not potentially cause further loss, they are nonetheless suspended because of MFCU's concern that the information contained in the statement (which includes amounts the account owner owes MFCU) might be construed as an attempt to collect on a prepetition debt in violation of the automatic stay.

Debtor Bobbitt attempted to use his ATM card at some point after filing his bankruptcy petition. When he was denied access to his account through his ATM card, he called MFCU and spoke with the Consumer Loan Manager, Doug Kuepfer ("Kuepfer"). At that time, Bobbitt first learned of the suspension of ATM access privileges to his account. During that phone conversation, Kuepfer did not inform Bobbitt of MFCU's cancellation of other services as well. Bobbitt did not inform his wife, Debtor McVay, of the suspension of ATM access privileges because his wife "tend[ed] to get upset over such things."

Thereafter, McVay attempted to use her ATM card to withdraw cash. When she was denied access to her account, she went into the MFCU offices. McVay was referred by a teller to Member Service Representative Carol Kulmayer ("Kulmayer"), located on the far side of the room. Kulmayer had been employed by MFCU for only three months at that time. When informed of McVay's problem, Kulmayer checked the status of Debtors' account and then called the Collection Department and spoke with Kuepfer. Kulmayer did not answer McVay's questions to her about the status of her account.

McVay contends that Kulmayer took McVay's ATM card and cut it up without explanation, that she was subsequently ignored by Kulmayer (although she asked Kulmayer numerous questions), and that she spoke with Kuepfer only after she had demanded for twenty minutes to see a manager. Once Kuepfer met with her, he allegedly told her that her account had been frozen indefinitely and that she would not be allowed to withdraw any funds.

MFCU contends that Kulmayer destroyed the ATM card pursuant to credit union policy and promptly informed McVay that a manager would be down shortly. Further, MFCU asserts that Kuepfer took seven minutes at most to arrive downstairs from his office, but McVay was already causing a disturbance in the MFCU lobby. As a result, Kuepfer took McVay into a private office and tried to answer a barrage of questions that McVay put to him. He testified that her continuous bombardment of questions did not give him the opportunity to respond in any meaningful way. Kuepfer testified that he did not remember McVay asking to withdraw any funds. He further testified that if he had understood that McVay wanted to withdraw her funds, he would have permitted her to do so.

Several days later, Bobbitt visited MFCU in order to cash a check he had written on an out-of-state account. Bobbitt's request was refused. He was then informed that MFCU would no longer negotiate his personal checks. Debtors contend that MFCU discontinued negotiation of Debtors' personal checks and other MFCU services in order to harass them. They further contend that MFCU was required to obtain relief from the automatic stay before it could terminate the various services to which they previously had access.

Debtors subsequently withdrew all but the minimum $25 balance required to maintain a savings account with MFCU. These funds remain available to the Debtors should they decide to close the account.

## II. *ISSUES PRESENTED*

A. Is the cancellation of a debtor's ATM access and personal check negotiation services, and the failure to send periodic account balance statements by a regional credit union because the debtor's bankruptcy plan would cause a loss to the credit union, a breach of the antidiscrimination provisions found in § 525?

B. Did MFCU exercise control over property of the estate in violation of § 362 when it cancelled the debtor's ATM access and personal check negotiation services, and failed to send periodic account balance statements?

C. Did MFCU prevent Debtors in this case from accessing funds in their account? Did MFCU know that McVay was requesting to withdraw cash from the Debtors' account? If yes, did MFCU exercise control over property of the estate, in violation of § 362?

D. Was the conduct of MFCU designed to harass the Debtors into paying their prepetition debt, in violation of § 362?

## III. *DISCUSSION*

A. *CANCELLATION OF A DEBTOR'S ATM ACCESS AND PERSONAL CHECK NEGOTIATION SERVICES, AND FAILURE TO SEND PERIODIC ACCOUNT STATEMENTS BY A REGIONAL CREDIT UNION WHERE THE DEBTOR'S BANKRUPTCY PLAN WOULD CAUSE A LOSS TO THE CREDIT UNION IS NOT PROHIBITED BY THE § 525 ANTIDISCRIMINATION PROVISION.*

Section 525(b) of the Bankruptcy Code states, in pertinent part:

No private employer may terminate the employment of, or discriminate against, an individual who is or has been a debtor under this title ... solely because such debtor or bankrupt—

(1) is or has been a debtor under this title ...

. . . . .

(3) has not paid a debt that is dischargeable in a case under this title ....

11 U.S.C. § 525(b).

■ To qualify for protection under § 525(b), a debtor must establish that: 1) the defendant is debtor's "employer," 2) employment has been terminated or withheld, and 3) termination or withholding was based solely on the ground of bankruptcy.

1. *Employer*

■ The parties did not cite to, nor has the Court located, any case law in the Ninth Circuit interpreting the term "employer" as used in § 525(b). The case cited by Debtors that discusses whether a credit union is an "employer" under § 525 is *In re Patterson,* 125 B.R. 40, 54 (Bankr.N.D.Ala.1990), *aff'd,* 967 F.2d 505 (11th Cir.1992).

In *Patterson,* the bankruptcy court held that, consistent with Congressional intent, the broad scope of § 525 was designed to cover *benefits* offered by parties affiliated with an employer. The court then noted that Congress had intended to include private organizations in its coverage under § 525(b), "such as exclusion from a union on the basis of discharge of a debt to the UNION'S CREDIT UNION." 125 B.R. at 53 (emphasis in original).

The Eleventh Circuit expressly affirmed the bankruptcy court's finding that the B.F. Goodrich Employees Federal Credit Union was "clearly" so "closely affiliated" with the debtor's employer, UniRoyal Goodrich, that Congress had intended to cover this type of situation under § 525. *In re Patterson,* 967 F.2d 505, 514 (11th Cir.1992).

The facts in the case pending before this Court are starkly different from those in *Patterson.* In this case, MFCU is *not* affiliated with DLI, Debtors' employer. Rather, according to evidence at trial, MFCU is chartered to serve *anyone* who either resides, or is employed, within the Monterey geographical region. MFCU has no affiliation with DLI, other than the fact that DLI is also located in Monterey County. Moreover, Debtors reside in Monterey County and qualify for membership in MFCU whether or not Debtors work at DLI. Thus, the facts of this case do not fall within the holding of *Patterson.*

Furthermore, the Court does not find any other evidence in the record that MFCU is Debtors' "employer," within the meaning of section 525(b).

2. *Employment*

■ Debtors also insist that MFCU's withdrawal of privileges is tantamount to termination or discrimination "with respect to employment." The Court finds it unlikely that Congress intended the reach of § 525 to be as broad as Debtors suggest in this case, since employment is not necessary for membership in MFCU, and anyone who resides

within the Monterey region is entitled to become a member of MFCU. As noted above, Debtors in this case reside within Monterey County and are entitled to be members on that basis alone. Without the necessary tie between employment and the credit union, there is no plausible discriminatory effect that the denial of MFCU services could have on a member's employment.

### 3. *Solely on the Basis of Bankruptcy*

■ Any discrimination or termination with respect to employment by a debtor's employer must also be shown to have been based *solely* on the ground that the bankruptcy case was filed.

Debtors testified that they were informed by MFCU officers that the withdrawal of services was "based on" the filing of their bankruptcy petition.

In defense, MFCU presented uncontroverted evidence at trial that it was MFCU's policy to withdraw services to *all* members who *cause a loss* to the credit union. Kuepfer, MFCU's Consumer Loan Manager, testified credibly to such policy. He also testified that upon learning of the Debtors' bankruptcy, the MFCU's Collection Department reviewed the Debtors' plan and determined that it proposed only a 10% payout. This led MFCU to conclude that Debtors would cause MFCU a loss with respect to Debtors' unsecured checkline account.

Based on this information, Kuepfer terminated services previously provided to Debtors that could potentially cause further loss to MFCU. ATM access to Debtors' account was terminated because it is possible to withdraw more money from the ATM than is actually in an account. Negotiation of the Debtors' personal checks was terminated because it poses the risk of the credit union paying out funds on a check drawn on insufficient funds. *Cf. Patterson*, 125 B.R. at 43 (Chapter 13 proposed 100% payout plan, causing no loss to credit union). Kuepfer further testified that, pursuant to MFCU's policies, services to a member who is in bankruptcy would not be withdrawn if that member would not cause a loss to the credit union.

The Court finds, based upon the evidence at trial, that MFCU withdrew services to the Debtors' because, consistent with MFCU's policy the Debtors had caused MFCU a loss, not because they had filed for bankruptcy.

The Court concludes that MFCU does not qualify as an employer for purposes of § 525, even under the permissive *Patterson* "affiliation" standard; that MFCU's withdrawal of services was not with respect to employment; and that withdrawal of services was not based solely on the filing of bankruptcy. Therefore, the antidiscrimination provisions of § 525(b) do not apply to this case.

### B. *CANCELLATION OF DEBTORS' ATM ACCESS AND CHECK NEGOTIATION PRIVILEGES, AND SUSPENSION OF ACCOUNT STATEMENTS BY A REGIONAL CREDIT UNION DO NOT VIOLATE THE AUTOMATIC STAY IMPOSED BY § 362 OF THE BANKRUPTCY CODE.*

Debtors argue that the relationship between MFCU and a member is contractual, and that the termination of the contractually provided privileges in this case operated as a violation of the § 362 automatic stay.

### 1. *A Contract for an Account and Services Between Debtor and MFCU Is Property of the Estate.*

■ Section 541(a)(1) includes as property of the estate "all legal or equitable interests in property as of the commencement of the case." Debtors cite to *In re Computer Communications*, 824 F.2d 725 (9th Cir.1987), in support of their argument that the contract between them and MFCU is property of the estate. In *Computer Communications*, the Ninth Circuit held that an executory contract, regardless of whether it is assumable or assignable, is property of the estate, and thus, the creditor must obtain relief from the automatic stay before it may terminate the contract. 824 F.2d at 728, 731.

The Ninth Circuit based its decision in *Computer Communications* on the legislative histories of § 362—citing the policies to "give the debtor a breathing spell from creditors, to stop all collection efforts, and to permit the debtor to attempt repayment or reorga-

nization"—and of § 541, citing the broad scope of property and interests that Congress intended to be property of the estate. 824 F.2d at 729. *See also In re Minoco Group of Companies, Ltd.,* 799 F.2d 517, 518 (9th Cir.1986) (insurance contracts are property of the estate).

Complete evidence of the contractual agreement between these parties was not adequately presented at trial. However, for purposes of this Decision, the Court is willing to infer from the conduct of the parties that a contract existed between Debtors and MFCU for the maintenance of a savings, a checking and a checkline account. Further, the Court will presume, for purposes of this Decision, that ATM access, personal check negotiation services and periodic statements were all material terms of the contract. In this connection, there is evidence in the record that Debtors regularly relied on these services. Therefore, based on the broad scope of § 541 as set forth in *Computer Communications,* the Court finds the contract between Debtor and MFCU for accounts and services is property of the estate.

2. *MFCU did not Terminate the Contract with Debtors in Violation of the Automatic Stay.*

■ Debtors next argue that in cancelling ATM access, personal check negotiation services and the sending of periodic statements, MFCU exercised control over property of the estate in violation of § 362. Section 362(a)(3) prohibits any entity from performing "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Debtors again cite to *Computer Communications* in support of their argument.

4. The Court does not decide today—because the issue is not before it—whether Debtors have an action for breach of contract against MFCU. The Court, however, notes that MFCU's policy of not giving members notice of cancellation of services on which such members may rely may cause serious problems.

In this connection, MFCU continues to use such member's money (the consideration for the contract provided by the members) and at the same time may be breaching the contract by unilaterally terminating services without notice.

Assuming for argument, as the Court does here, that a valid contract between the parties existed, the Court will also assume *arguendo,* that MFCU's acts in cancelling material services such as ATM access, personal check negotiation services and in not sending periodic statements constituted a material breach of the contract.

However, under California law, a breach of contract is not tantamount to termination. "A breach does not terminate a contract as a matter of course, but is a ground for termination at the option of the injured party. (Citations omitted.) Thus a finding of termination is not one which must be implied from a finding of a breach." *Whitney Investment Company v. Westview Development Company,* 273 Cal.App.2d 594, 78 Cal.Rptr. 302, 308 (1969). Furthermore, Debtors still maintain the required $25.00 minimum balance in their open account and may add to that amount at any time. They may still earn interest on their money if the account is interest bearing. Clearly, MFCU did not terminate the entire contract here.

Nor has the Court found or have the Debtors provided any cases in support of the proposition that a creditor's mere breach of a contract requires relief from the automatic stay. In addition, the holding of *Computer Communications* is clear: *unilateral termination* of a contract by a creditor requires relief from the automatic stay. The Court declines to expand the holding of *Computer Communications* to breaches of contract not tantamount to a termination.

Therefore, the Court holds that since the cancellation of services did not constitute a termination of the contract, MFCU did not violate the automatic stay.[4]

Moreover, it is not difficult to hypothesize examples of situations where MFCU's no-notice policy may cause members severe actual damage (*e.g.,* inability to close on a real estate transaction, or to purchase medicine over a weekend, or to deal with numerous other emergency situations that may arise).

The Court also notes that if given advance notice, debtors could have moved their funds to a new credit union, bank, or other financial institution.

## C. *CREDIT UNION'S REFUSAL TO PERMIT WITHDRAWAL OF FUNDS BY DEBTOR FROM PERSONAL ACCOUNT DID NOT VIOLATE § 362 WHEN DEBTOR DID NOT MAKE IT CLEAR SHE WANTED TO WITHDRAW FUNDS.*

■ Section 362(a)(3) of the Bankruptcy Code states that the filing of a petition in bankruptcy:

operates as a stay, applicable to all entities, of ...

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

11 U.S.C. § 362(a)(3).

In this case, Debtors' account funds are clearly property of the estate under § 541. The issue is whether Debtors were denied access to their funds through a willful exercise of control over those funds by MFCU's alleged refusal to accede to McVay's request to withdraw money from Debtors' account.

The events that transpired at MFCU on the day in question are not entirely clear. McVay testified that Kulmayer took the ATM card, and without explanation, cut it up in front of everyone in the lobby, and then proceeded to ignore McVay. McVay further testified that she requested to withdraw $20, but Kulmayer continued to ignore her. In addition, McVay stated that she had to demand to see a manager for twenty minutes before Kuepfer came down to see her. On Kuepfer's arrival, Kuepfer and McVay went to a private office where Kuepfer allegedly told her that her account was indefinitely frozen and that she could not make a withdrawal.

MFCU employees testified that Kulmayer requested the card from McVay and destroyed it in front of her, pursuant to MFCU policy and at the direction of Kuepfer. Kulmayer testified that McVay was promptly informed that Kuepfer would be there shortly to discuss her account with her, but McVay became agitated and began to make a scene inside the MFCU offices. Kulmayer and her supervisor, Sara Tufford ("Tufford"), attempted to calm her down until Kuepfer could come to the lobby.

Both Kulmayer and Tufford testified that they never understood McVay to be requesting to withdraw any money from her account. When Kuepfer entered the lobby from his office, he testified that McVay was still visibly upset. He directed McVay into an enclosed office and attempted to discuss the account with her. Kuepfer further testified that McVay, in an excited and agitated state, continuously fired questions at him, not permitting him time to respond. Ultimately, Kuepfer suggested that she instead speak with her attorney about the situation.

Kuepfer denied ever having told McVay that her account was frozen indefinitely. In addition, Kuepfer testified that he did not at any time understand McVay to be requesting to withdraw money, and that had he known that was McVay's intent, he would have permitted her to make a withdrawal.

After weighing the testimony of all parties, the Court concludes that while McVay may well have requested to withdraw funds, the request was never effectively communicated to MFCU because of the tumultuous circumstances that day. McVay was clearly upset by the acts of MFCU's employees, and MFCU's employees were trying to handle the situation as professionally as possible. Kulmayer felt frozen and unable to act because of her inexperience, and the instructions from her superiors, and Kuepfer's personal "style" is that of self-control, rather than lively discourse. McVay, on the other hand, given her style, reasonably wanted prompt and direct answers to all of her questions, and she became enraged when she perceived that she was being stonewalled by Kulmayer and then Kuepfer. It seems clear to the Court that personalities and personal styles prevented effective communication.

While the Court is of the view that MFCU employees should have been more forthcoming in their explanations to McVay and that Kulmayer should have been better trained in bankruptcy matters, this type of miscommunication is not the type of conduct violative of the automatic stay. Therefore, the Court finds that there was no willful exercise of control over property, in violation of § 362.

D. *THE ACTIONS OF THE CREDIT UN-*
*ION IN THIS CASE WERE NOT DE-*
*SIGNED TO HARASS THE DEBT-*
*ORS INTO PAYING THEIR PREPET-*
*ITION DEBT IN FULL AND THERE-*
*FORE DO NOT WARRANT FINDING*
*A VIOLATION OF § 362.*

 Finally, Debtors argue that MFCU's conduct in and of itself—that is, cancelling services without notifying Debtors of the change in their privileges and MFCU's treatment of McVay at the MFCU offices— was calculated by MFCU to harass Debtors into paying their prepetition debts in full, in violation of § 362.[5] Section 362(a)(6) stays "any act to collect, assess or recover a claim against the debtor that arose before the commencement of a case under this title." Case law has expanded the protective scope of this section to include harassment of the debtor in order to induce full payment on a prepetition debt. *See Morgan Guaranty Trust Company of New York v. American Savings and Loan Association,* 804 F.2d 1487 (9th Cir.1986), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987).

1. *MFCU's Cancellation of Services with-*
*out Notice of the Change was not Intend-*
*ed to Compel Full Payment on a Prepet-*
*ition Debt.*

In this case, MFCU withdrew services and ceased to generate account statements without giving any notice to the Debtors. According to the evidence, MFCU takes such actions whenever *any* shareholder causes it a loss, not just those who also file bankruptcy.

The Court finds the no-notice policy problematic. As discussed above, such a procedure could likely result in a depositor becoming stranded and without funds when he/she needs them the most, or leaving a depositor without critical information regarding his/her account. Moreover, it is not unusual for debtors to be people who have trouble keeping track of money and organizing their assets and liabilities. Bank statements are important organizational tools. To deprive debtors of such statements without notice has the potential to impact negatively on their ability to reorganize.

However, the Court finds that MFCU's policies and actions were not designed to compel payment of a prepetition debt. In this regard, MFCU's no-notice practice is based at least in part on its concern that its communication to a debtor that services have been terminated, or receipt by a debtor of a statement that shows a debt owed, could potentially be seen as an attempt to compel payment. *See, e.g., In re Brown,* 851 F.2d 81 (3rd Cir.1988).

The Court is not necessarily convinced at this juncture that MFCU's "concern" warrants the particular actions they are taking. However, the Court was impressed that MFCU appeared to be motivated primarily by a desire to follow the law and not by a wish to harm or harass debtors. Moreover, there was no evidence in this case of any actual damage to Debtors or their reorganization efforts other than some unpleasantness and some minor inconvenience.

Also, MFCU presented some evidence concerning the cost to MFCU and infeasibility of such alternatives as modifying its computer program to selectively generate statements based on a member's status as a bankrupt or one who caused a loss to MFCU.

Based on consideration of all of these factors, the Court does not find MFCU's actions in cancelling Debtors' services to have been violative of the automatic stay.

---

5. During oral argument, Debtors also argued that the culmination of acts that do not individually violate the automatic stay can be interpreted as a course of conduct designed to harass the debtor, in violation of the automatic stay. Debtor has cited to no authority in support of its position.

The Court notes that *Morgan Guaranty Trust Company of New York v. American Savings and Loan Association,* 804 F.2d 1487 (9th Cir.1986),

*cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987), expanded the scope of § 362(a)(6) only to include harassment of a debtor where it is accompanied by an act to collect, assess or recover a prepetition claim. Thus, the Court is not aware of any authority to the effect that a number of separate acts that do not individually amount to a violation of the automatic stay can, in the aggregate, constitute a violation of the automatic stay.

*2. MFCU's Conduct in Dealing with McVay was Pursuant to MFCU Policy and not Intended to Compel Full Payment of Prepetition Debt.*

██ As for the incident with McVay at MFCU's offices, the Court finds that MFCU's employees' conduct was not designed to compel Debtors to pay off their checkline balance.

The testimony indicated that MFCU's policy requires the immediate destruction of invalid ATM cards in front of the member so as to assure that the card is no longer usable as well as to protect against employee misconduct. Furthermore, the individual responsible for destroying McVay's card was separated from the rest of the office by two partitions, affording some privacy from the other credit union members. Debtors admitted that McVay had a tendency to get "excited" and there was consistent testimony that she was in fact excited and agitated that day at MFCU. But most important, there is uncontroverted evidence that MFCU employees were *not* acting intentionally either to humiliate or embarrass McVay, or to compel payment on her prepetition debt.

Based on these facts, the Court concludes that MFCU's conduct toward McVay was not calculated to harass the Debtors into fully paying off their prepetition debt, and consequently, did not violate the automatic stay.

## IV. *CONCLUSION*

This Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Based on the foregoing, the Court finds that the conduct of MFCU has not been shown to violate either the § 362 automatic stay or the § 525 anti-discrimination provisions of the Bankruptcy Code. Therefore, debtors Motion for Sanctions is denied. Counsel for MFCU shall submit a proposed Order consistent with this Decision.