In re **MASTERWEAR CORPORATION,** et al., Debtors.

**BNY Financial Corporation, Plaintiff,**

v.

**Masterwear Corporation,** et al., Defendants.

**Bankruptcy No. 97 B 47083–88(SMB).**
**Adversary No. 98/8415A.**

United States Bankruptcy Court, S.D. New York.

Feb. 1, 1999.

Hahn & Hessen LLP, New York City (John P. Amato, Joshua I. Divack, Maria A. Arnott, Of Counsel), for Plaintiff.

Salomon Green & Ostrow, P.C., New York City (Nicholas F. Kajon, David A. Levin, Of Counsel), for Debtor–Defendants.

Graham & James LLP, New York City (Jeffrey R. Mann, Of Counsel), for Norman Bernard.

Togut, Segal & Segal, New York City (Frank A. Oswald, Neil Berger, Of Counsel), for Signal Capital Corporation and Itel Rail Holdings Corp.

## MEMORANDUM DECISION REGARDING CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

STUART M. BERNSTEIN, Bankruptcy Judge.

Plaintiff BNY Financial Corporation ("BNY"), the debtors' prepetition factor, commenced this adversary proceeding to recover sums allegedly due under the factoring agreement. The debtors denied liability, and asserted several counterclaims. Each party

subsequently moved for summary judgment, but preliminarily, the Court limited the motion to two issues: (1) are the debtors required to pay BNY a Minimum Volume Charge, described below, for 1998, and (2) did BNY violate the automatic stay or the postpetition financing orders by twice imposing an administrative freeze on the debtors' bank account?

For the reasons that follow, the Court grants BNY's motion for summary judgment dismissing the debtors' contempt counterclaims to the extent that they are based on violations of the automatic stay. The remaining questions before the Court turn on material and disputed factual issues that preclude summary judgment.

## BACKGROUND

### A. The Prepetition Relationship Between the Debtors and BNY

At all relevant times, Masterwear Corporation ("Masterwear") and its affiliated co-debtors were engaged in the manufacture and sale of men's and boy's dress and casual pants to retailers. On May 16, 1991, Masterwear entered into an agreement with BNY to factor its accounts receivable (as amended, the "Factoring Agreement"). The Factoring Agreement (PX "1")[1] provided, in pertinent part, that Masterwear would sell its receivables to BNY, (*id.*, ¶ 1(a)), who would charge a commission of 0.75% on the face amount of each receivable purchased during the month. (*Id.*, ¶ 4(b)(ii).) Although BNY assumed the risk of the purchaser's solvency, its risk did not extend to returns or disputed invoices. (*Id.*, ¶¶ 2, 10(c).) If a customer asserted a dispute or returned merchandise, BNY could charge back the amount of the affected receivable to Masterwear's account. (*Id.*, ¶ 7(d).) As a result, Masterwear repaid chargebacks on an ongoing and current basis.

The Factoring Agreement imposed a minimum commission, called a "Minimum Volume Charge." (*See id.*, ¶ 4(b)(ii).) Masterwear

was committed to factoring at least $25 million in receivables each Calendar Year while the Factoring Agreement remained in effect. If Masterwear factored fewer receivables, BNY charged Masterwear the difference between the commissions on $25 million and on the amount of receivables actually factored.[2] Of importance here, Masterwear also had to pay the Minimum Volume Charge for the "Partial Last Year," *i.e.*, the calendar year in which the Factoring Agreement was terminated. For example, if the Factoring Agreement was terminated in February, 1997, Masterwear still had to pay the Minimum Volume Charge for 1997. The co-debtor affiliates guaranteed Masterwear's obligations. (PX "3".)

As discussed in more detail below, paragraph 9 empowered either party to terminate the Factoring Agreement. BNY could do so on 60 days written notice, except that it could terminate immediately upon the occurrence of certain enumerated events. Masterwear could only terminate the Factoring Agreement in any year on the anniversary date, May 16. Further, Masterwear had to give 60 days prior written notice. In other words, if Masterwear did not send a written termination notice by March 17th, it could no longer unilaterally terminate the Factoring Agreement during that Calendar Year.

### B. The Parties' Postpetition Relationship

#### 1. The Financing Orders and Letter Agreement

The debtors filed these chapter 11 cases on October 27, 1997. They immediately sought approval of a postpetition revolving loan agreement with Signal Capital Corporation ("Signal"). The application called for the "priming" of BNY's prepetition liens pursuant to 11 U.S.C. § 364(d). BNY initially objected, but subsequently entered into an October 31, 1997 letter agreement (the "Letter Agreement") with the debtors and Signal. (PX "36".) The Court entered Interim and Final Financing Orders (collectively, the "Fi-

---

1. "PX" refers to the exhibits submitted by BNY in connection with its motion for summary judgment.

2. The Minimum Volume Charge thus assured BNY of earning at least $187,500.00 ($25 million × 0.75%) in any year in which the Factoring Agreement was in effect.

nancing Orders"), dated October 31, 1997 and November 12, 1997, respectively, (PX "34" and "35") which incorporated the Letter Agreement.[3]

The Postpetition Agreements, *inter alia*, terminated the factoring relationship—BNY no longer "bought" the debtors' accounts receivable. Instead, BNY became a collection agent for the debtors' postpetition accounts receivable (the "New Receivables").[4] The Factoring Agreement continued, however, to play a role in the new arrangement. The Letter Agreement states that the parties will continue to operate under the "*mechanics* set forth in the Factoring Agreement relating to the posting, collection and remittence of the New Receivables." (Emphasis added)(PX "36", ¶ 1.) The Final Financing Order provides that "the Debtors shall comply with the provisions of the Factoring Agreement relating to interest, *commissions*, late payment charges, disputes, returns, and chargebacks, except to the extent specified herein or superseded by the Debtors' obligations to BNY under this Order." (Emphasis added)(PX "35", ¶ 17.) The Postpetition Agreements do not specifically mention the Minimum Volume Charge for 1998.

The parties agreed that BNY would deposit the proceeds of the New Receivables into the newly created, No. 2 account (the "Account"). BNY had limited setoff rights against the Account. The Letter Agreement states:

> [BNY] shall establish a new account on its books which shall hereinafter be referred to as the "No. 2 Account", which account shall be credited with the proceeds of all New Receivables. [BNY] hereby agrees not to offset against any monies credited to the No. 2 Account any liabilities or claims which existed prior to the Petition Date or which may come into existence after the Petition Date, other than the commission set forth in paragraph 3 hereof.

(PX "36", ¶ 4.)

Finally, the Financing Order provided BNY with adequate protection against a diminution in its prepetition collateral and cash collateral.[5] First, the debtors granted BNY a first security interest, up to a maximum amount of $750,000.00, in the debtors' "prepetition and post-petition inventory and accounts receivable and the first proceeds and products thereof." (PX "35", ¶ 14(b).) Second, BNY received a lien, junior to Signal's lien, in all other assets of the estates. (*Id.*, ¶ 14(c).) Third, the debtors had to continue paying valid chargebacks, arising in connection prepetition, factored receivables, provided the cash was available under the Signal revolving loan agreement. (*Id.*, ¶ 14(e)). The failure to pay valid chargebacks was an event of default under the Letter Agreement, (PX "36", ¶ 6(d)), and entitled BNY to seek relief from the automatic stay or additional adequate protection. (PX "35", ¶ 27.)

### 2. The Dispute Over Chargebacks and the Account

In December 1997, BNY contended that the debtors had failed to pay chargebacks totaling $266,403.04, (*see* PX "38"), and on December 17, 1997, froze the Account. (*Affidavit of Anthony Marsicano in Support of Plaintiff's Motion for Summary Judgment*, sworn to October 14, 1998 ("*Marsicano Affidavit* "), ¶ 80.) The debtors, for their part, had accused BNY of improperly withholding remittances from the Account in violation of the terms of the Letter Agreement. BNY responded that it had the right to hold the proceeds for six days before remitting them to the debtors. Masterwear contended that it was entitled to remittance as soon as the funds were collected from the payor's bank. (*Id.*, ¶ 78.)

This first administrative freeze lasted until January 7, 1998. During the period of the freeze, the parties negotiated a resolution, and entered into a letter settlement agreement ("Settlement Agreement"). (PX "40".) The Settlement Agreement permitted BNY

---

**3.** The Letter Agreement and Financing Orders are sometimes collectively referred to as the "Postpetition Agreements."

**4.** The commission rate on New Receivables was reduced from 0.75% to 0.5%.

**5.** The Factoring Agreement and related security agreement, (PX "2"), also granted BNY a security interest in inventory and receivables.

to hold the proceeds for four days, and settled the dispute over chargebacks. Masterwear agreed that it owed $279,036.96, and allowed BNY to offset this sum against $369,-319.10 in the Account. The Settlement Agreement was not submitted to the Court for approval. On February 25, 1998, BNY imposed a second administrative freeze on the Account.[6] This freeze lasted until March 5, 1998. BNY claims that the second freeze was a "simple administrative error."

By letter dated March 12, 1998 (PX "46"), Masterwear immediately terminated the Factoring Agreement and related arrangements, and expressed its desire to agree with BNY on the amount it owed. At present, the only remaining disagreements involve BNY's claims for the 1998 Minimum Volume Charge and attorneys fees.

## DISCUSSION

### A. BNY's Right to the Minimum Volume Charge for 1998

#### 1. The Summary Judgment Standard in Contract Disputes

The first question raised by the pending motions relates to BNY's right to summary judgment for the 1998 Minimum Volume Charge. The answer is governed by the parties' various agreements. The primary objective when interpreting a contract is to give effect to the parties' intent as revealed in the language that they used. *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). A court may grant summary judgment in a contract dispute only where the agreement is unambiguous and conveys a definite meaning, or the contract is ambiguous but there is no extrinsic evidence of the parties' intent. *Chase Manhattan Bank,*

*N.A. v. American Nat'l Bank & Trust Co.*, 93 F.3d 1064, 1073 (2d Cir.1996); *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d at 1094; see *Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir.1994); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d at 428.

Ambiguity presents a question of law to be decided in light of the entire agreement. *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d at 1094–95. Parol evidence is not admissible to create an ambiguity. *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir.1996). An agreement is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contract and knows the customs, practices, usages and terminology generally understood in the particular trade or business. *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996); *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d at 1095; *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d at 428; *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987).

#### 2. The Debtors' Failure to Give A Termination Notice Until 1998

As noted, the Factoring Agreement obligates the debtors to pay the Minimum Volume Charge through and including the Partial Last Year. It defines the Partial Last Year as "the part of the last Calendar Year during which [the Factoring Agreement] is in effect if it is terminated before the end of a Calendar Year." (PX "1", ¶ 4(b)(ii)). The Factoring Agreement could be terminated by either party pursuant to paragraph 9:

**6.** The debtors reply papers suggest, for the first time, that during the pendency of the second freeze, BNY actually set off the 1998 Minimum Volume Charge against the Account. (*See Debtors' Reply to Plaintiff's Response in Opposition to Debtors' Cross–Motion for Partial Summary Judgment*, dated Dec. 14, 1998 ("*Debtors' Reply*"), ¶¶ 17–22 & Ex. "B".) However, neither their pleadings nor their cross-motion made this claim, and the debtors cannot raise it, for the

first time, in the reply to their own cross-motion. *Chase Manhattan Bank, N.A. v. T & N plc*, 905 F.Supp. 107, 122 n. 5 (S.D.N.Y.1995); *Signon v. Parker Chapin Flattau & Klimpl*, 901 F.Supp. 667, 677 n. 5 (S.D.N.Y.1995); see *United States v. Gigante*, 39 F.3d 42, 50 n. 2 (2d Cir.1994)(an appellant cannot raise arguments for the first time in his reply brief), *modified*, 94 F.3d 53 (2d Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 179, 139 L.Ed.2d 119 (1997).

(a) This agreement shall remain in full force and effect until terminated as follows:

(i) We [BNY] may terminate this agreement at any time upon sixty (60) days prior written notice to you [Masterwear]. *If not so terminated,* this agreement shall remain in full force and effect unless you give us written notice of termination ... not less than sixty (60) days prior to and effective as of May 16....

(Emphasis added.) Accordingly, if either party terminated the Factoring Agreement in 1997, 1997 would be the Partial Last Year.

BNY contends, however, that Masterwear had to terminate the agreement by March 17, 1997, to lock in 1997 as the Partial Last Year; otherwise, the agreement would continue into 1998. A subsequent BNY termination in 1997 would not affect this result. As a corollary, BNY argues that its right to the 1998 Minimum Volume Charge vested on March 18 in the absence of a timely, Masterwear termination.

BNY's interpretation is not supported by the language in the Factoring Agreement. It ignores the first sentence of ¶ 9(a)(i) and the introductory clause in the second sentence. It also ignores the definition of "Partial Last Year" in ¶ 4(b)(ii) which depends simply on a "termination," and not a Masterwear termination.

BNY's interpretation could also lead to an absurd result, requiring the debtors to pay the Minimum Volume Charge forever. If Masterwear did not send a timely termination notice in 1997, but BNY sent one on March 20, 1997, BNY would argue, as it has, that the debtors were still obligated to pay the 1998 charge. It accrued and vested on March 18, even though BNY would not be obligated to buy, and in fact, would not buy, another receivable from the debtors after the 60 day notice period expired.

Furthermore, the debtors' obligation to pay the Minimum Volume Charge would never end. Only Masterwear could create a "Partial Last Year" by terminating the Factoring Agreement. Pursuant to paragraph 9(a)(i), however, Masterwear could not exercise its right to terminate if BNY had already terminated. Hence, Masterwear could never terminate the Factoring Agreement, and would have to pay the Minimum Volume Charge forever.

The plain language of the Factoring Agreement confirms that this is not the case. Masterwear's admitted failure to send a timely 1997 termination notice does not automatically mean that 1997 was not the Partial Last Year. Resolution of BNY's motion turns, therefore, on whether some other event transformed 1997 into the Partial Last Year.

### 3. The Termination of the Factoring Agreement in 1997

#### a. The Prepetition Termination

■ The debtors first contend that BNY terminated the Factoring Agreement for cause in August, 1997, prior to the commencement of these chapter 11 cases. Indeed, it is undisputed that BNY sent two letters, dated August 7, 1997, (PX 19), and August 11, 1997, (PX 20), terminating the Factoring Agreement. However, by letters dated August 22, 1997, (PX 24), and September 4, 1997, (PX 26), BNY, Masterwear, Signal and Itel Rail Holdings Corporation, agreed to rescind the termination, and "reinstated [the Factoring Agreement] in full force and effect." In each reinstatement letter, Masterwear also requested and authorized an additional advance under the Factoring Agreement ($80,000.00 on August 22 and $175,400.00 on September 4). The debtors maintain BNY did not make the requested advances, and therefore, the reinstatement letters were ineffective. (*Debtors' Reply,* ¶ 3.)

This point deserves short shrift. First, the letters plainly reinstate the Factoring Agreement immediately and unconditionally. Further, the Factoring Agreement made advances discretionary with BNY. (*See* PX "1", ¶ 4(a).) Second, the debtors have, on other occasions, represented to the Court that BNY continued to finance their operations through the petition date. For example, the postpetition financing application, dated October 28, 1997, (PX "32"), states that "[s]ince 1991, BNY has been funding the Debtors'

operations through term loans and a factoring agreement." (*Id.*, ¶ 11; *accord* ¶ 29.) After the formation of an informal creditors' committee on August 11, 1997, and until the October 27 filing date, BNY was only willing to advance funds averaging 35% of the debtors' sales. (*Id.*, ¶ 29.) The debtors estimated that BNY still owed the estates over $3 million based on receivables purchased within 45 days of the petition date, or since September 12, 1997. (*See id.*, ¶ 44.) Accordingly, the Factoring Agreement had been reinstated and was in full force and effect on the petition date.

### b. The Termination by Operation of Law

■ Next, the debtors contend that the filing of Masterwear's chapter 11 petition terminated the Factoring Agreement by operation of law. They draw this conclusion from the language of 11 U.S.C. § 365(c)(2) which prevents Masterwear from assuming and assigning a contract of financial accommodation.[7] They reason that if Masterwear could not assume the Factoring Agreement— which the parties agree is a nonassumable contract of financial accommodation—the filing must automatically terminate it.

■ The debtors do not cite to any supporting authority, and the language in section 365 leads to the opposite conclusion. Section 365 deals with assumption and rejection. Even if the debtors' logic led to the conclusion that the Factoring Agreement was "deemed rejected" on the petition date, a rejection is different from a termination. *See Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne )*, 114 F.3d 379, 386–87 (2d Cir.1997).

More importantly, § 365 implies that termination does not occur by operation of law. The Bankruptcy Code excepts *ipso facto* clauses in nonassumable financial accommodation agreements from the general prohibition against the enforcement of *ipso facto* clauses. 11 U.S.C. § 365(e)(2)(B). If a bankruptcy filing terminated all such agreements by operation of law, the exception would be superfluous. The financial accommodation agreement would terminate with or without an *ipso facto* clause. Thus, the debtors' contention that the Masterwear filing terminated the Factoring Agreement must also be rejected.

### c. The Effect of the Postpetition Agreements

■ Finally, the debtors' maintain that the Factoring Agreement, or at least the obligation to pay the 1998 Minimum Volume Charge, was terminated by the Postpetition Agreements. Here, they may be on firmer ground. The parties were free to modify their obligations under the Factoring Agreement by mutual, written consent, (*see* PX "1", ¶ 12(g)), and clearly did so when they entered into the Postpetition Agreements. The debtors no longer sold and BNY no longer purchased receivables. Instead, the debtors assigned their New Receivables to BNY for collection purposes only, at a reduced commission rate.[8] The Postpetition Agreements do not mention the Minimum Volume Charge, and refer only obliquely to the Factoring Agreement. The Letter Agreement adopts the "mechanics" of the Factoring Agreement related to posting, collection and remittence of the New Receivables. The Financing Order states that the debtors must continue to comply with the provisions of the Factoring Agreement relating to interest, commissions, late payment, chargebacks, *etc.*, except to the extent modified or superseded by the Postpetition Agreements.

The debtors argue that the Postpetition Agreements terminated the obligation to pay the Minimum Volume Charge in 1998. The Factoring Agreement lends some support.

---

7. Section 365(c)(2) states:
 The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if ... such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

8. In computing the 1998 Minimum Volume Charge, BNY has ignored the reduction and used the higher, 0.75% rate in its calculations.

Paragraph 4(b)(ii) indicates that the commissions payable under the Factoring Agreement represented consideration for BNY's factoring services, and were based on the face amount of the receivables that BNY "purchased." Also, the Minimum Volume Charge simply entitled BNY to a minimum compensation for factoring receivables on which "you [Masterwear] are obligated to pay commissions and which you sell and assign to us [BNY]." The agreement suggests that the right to commissions and the Minimum Volume Charge were inseparable, and depended on the existence of mutual obligations to purchase and sell receivables. Conversely, the obligation to pay factoring commissions, or the minimum factoring commission under the guise of a Minimum Volume Charge, arguably terminated along with the obligation to factor.

BNY reads the agreements differently, and concludes that the Postpetition Agreements did not affect the Minimum Volume Charge. It points to the provisions in the Final Financing Order that required the debtors to comply with the provisions of the Factoring Agreement, including those affecting commissions, until BNY was paid in full. The Minimum Volume Charge is simply the minimum commission payable under the Factoring Agreement. In addition, the Postpetition Agreements do not expressly modify the Minimum Volume Charge obligation, and the Final Financing Order preserves all rights not expressly modified by the Postpetition Agreements. Further, it would be unreasonable to imply that BNY intended to release the debtor from its liability for the 1998 charge. BNY did not have to factor postpetition or perform under the Factoring Agreement. If it did nothing further, it would still be entitled to collect the 1998 charge.

I conclude from the foregoing that the Postpetition Agreements, read in conjunction with the Factoring Agreement, are ambiguous. The Postpetition Agreements do not mention the Minimum Volume Charge and refer in a vague way to the continuing applicability of the Factoring Agreement. Given the significant changes made by the Postpeti-

tion Agreements, their reference to the obligation to comply with the terms of the Factoring Agreement is unclear. Moreover, as noted, the debtors' interpretation regarding the link between the obligation to factor and the right to a Minimum Volume Charge cannot be summarily rejected.

Further, while BNY persuasively argues that I should not infer its surrender of the fully vested right to collect the 1998 charge, I cannot ignore the fact that the Postpetition Agreements also settled its dispute with the debtors. The debtors had sought in their financing application to "prime" BNY's prepetition liens under section 364(d), and BNY objected. (*See* PX "33".) The Postpetition Agreements resolved the priming fight and granted BNY a first lien, up to $750,000.00, in the debtors' prepetition and postpetition inventory and receivables. It may be that BNY was willing to give up one set of disputed rights to acquire another set of uncontested rights as part of the resolution.

In any case, each of the parties has offered a reasonable explanation of the meaning and effect of the Postpetition Agreements on the Minimum Volume Charge obligation. Accordingly, a trial is necessary, and summary judgment must be denied.

**B. Summary Judgment and the Debtors' Counterclaims**

The remaining issues before the Court concern the debtors' counterclaims based on the two administrative freezes. The Sixth Counterclaim (concerning the first freeze) and the Seventh Counterclaim (concerning the second freeze) charge BNY with contempt. The debtor alleges that the freezes violated the automatic stay and the terms of the Financing Orders. The fact of the freezes is not contested, and both sides have moved for summary judgment.

**1. Violation of the Automatic Stay**

 The debtors contend that the administrative freezes interfered with property of the estate and violated 11 U.S.C. § 362(a)(3).[9] *([Debtors'] Memorandum of*

---

9. Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property

from the estate or to exercise control over property of the estate."

*Law [etc.],* dated Nov. 17, 1998, at 18.) State law normally determines the extent of an interest in property, absent an overriding federal policy. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Morton v. Nat'l Bank of New York City (In re Morton ),* 866 F.2d 561, 563 (2d Cir.1989). Bankruptcy law determines whether that interest is "property of the estate." *In re Prudential Lines, Inc.,* 928 F.2d 565, 569 (2d Cir.), *cert. denied,* 502 U.S. 821, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991); *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1101 (2d Cir.1990); *In re Haedo,* 211 B.R. 149, 151 (Bankr.S.D.N.Y. 1997).

 Under New York law, a bank and its depositor stand in a debtor-creditor relationship that is contractual in nature. *E.g., Middle East Banking Co. v. State Street Bank Int'l,* 821 F.2d 897, 901 (2d Cir.1987); *Aspen Indus., Inc. v. Marine Midland Bank,* 52 N.Y.2d 575, 439 N.Y.S.2d 316, 421 N.E.2d 808, 812 n. \* (N.Y.1981). The bank owns the deposit, the depositor has a claim to payment against the bank, and the bank has a corresponding obligation to pay its depositor. *In re Trevor's Estate,* 309 N.Y. 389, 131 N.E.2d 561, 563 (N.Y.1955); *In re Delaney,* 256 N.Y. 315, 176 N.E. 407, 409 (N.Y.1931); *Rosenhack v. Chemical Bank & Trust Co.,* 91 Misc.2d 817, 398 N.Y.S.2d 787, 788–89 (N.Y.Civ.Ct.1977). Accordingly, a bank's temporary freeze of an account, without more, is "neither a taking of possession of [the depositor's] property nor an exercising of control over it, but merely a refusal to perform its promise." *Citizen's Bank of Maryland v. Strumpf,* 516 U.S. 16, 21, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); *see In re Bobbitt,* 174 B.R. 548, 554 (Bankr.N.D.Cal. 1993)(bank's breach of contract with debtor-depositor does not violate the automatic stay).

The parties have not presented facts or suggested that the Account is subject to a different rule. Hence, the debtors did not have a property interest in the account such that BNY's temporary freeze would violate section 362(a)(3). As a result, BNY is entitled to summary judgment dismissing those portions of the Sixth and Seventh Counterclaims alleging violations of the automatic stay.

### 2. Violation of the Final Financing Order

#### a. The Debtors' Motion

 The debtors also claim that the administrative freezes violated the Financing Order, and seek to hold BNY in contempt. A bankruptcy court has the inherent power, under 11 U.S.C. § 105, to hold parties in civil contempt for violation of its own orders. *In re Ionosphere Clubs, Inc.,* 171 B.R. 18, 21 (S.D.N.Y.1994); *Stockschlaeder & McDonald, Esqs. v. Kittay (In re Stockbridge Funding Corp.),* 145 B.R. 797, 803 (Bankr. S.D.N.Y.1992), *aff'd in relevant part,* 158 B.R. 914 (S.D.N.Y.1993). The movant must show (1) that the order not complied with is clear and unambiguous, (2) the proof of the noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner. *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir.1995).

 The debtors' cross-motion for summary judgment must be denied. The claimed violations of the Financing Order mirror the alleged violations of the automatic stay. Thus, the debtors argue that the freeze violated the Financing Order, but they have not identified the "clear and unambiguous" provision that has been violated. They discuss only the anti-setoff provision, (Debtors' Memo. 16), but BNY did not set off; it only imposed administrative freezes.[10]

**10.** As noted, the debtors' reply papers assert, for the first time, that the second administrative freeze was accompanied by an actual setoff of the 1998 Minimum Volume Charge. I have not considered this belated argument in connection with the grant of summary judgment dismissing the charge of the automatic stay violations for the reasons already discussed. However, I am not granting summary judgment to either party in connection with the alleged violations of the Financing Order. The debtors may be able, at trial, to demonstrate that BNY set off in violation of the Financing Order.

### b. BNY's Motion

### i. The First Administrative Freeze

■ BNY is not entitled to summary judgment either. It defends the first administrative freeze, arguing that it was necessary to preserve its right of recoupment. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, dated Oct. 19, 1998, 36–39.) Assuming that the anti-setoff provision did not foreclose recoupments, BNY has nevertheless failed to demonstrate that a right of recoupment existed. Recoupment is a defense that springs from the common law. It "permits a transaction which is the subject of a suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole." *In re Malinowski*, 156 F.3d 131, 133 (2d Cir.1998)(quoting *Constantino v. State*, 99 Misc.2d 362, 415 N.Y.S.2d 966, 968–69 (N.Y.Ct.Cl.1979)). For example, if a plaintiff sues to recover damages under a contract, the defendant may defend, partially or completely, by showing that the plaintiff owes the defendant money under the same contract.

BNY argues that its duty to pay the debtors the proceeds in the Account and its right to receive payment of the chargebacks arose from the same contract or transaction, *viz.*, the Final Financing Order. As part of the adequate protection given to BNY, Paragraph 14(e) required the debtors to pay the disputed chargebacks generated as a result of prepetition receivables. According to BNY, the Final Financing Order therefore created a postpetition obligation to pay valid chargebacks. Similarly—BNY argues—the Final Financing Order incorporated the Letter Agreement which, in turn, created the Account. BNY concludes that the parties' claims, *inter se*, arose out of the Final Financing Order, and it was entitled recoup its chargebacks from the proceeds of the Account. BNY imposed the first administrative freeze to preserve that right.[11]

■ Recoupment, like setoff, operates to prefer one creditor over every other. Given the strong policies favoring debtor protection and equal treatment of creditors, the doctrine of recoupment in bankruptcy is a narrowly construed, equitable exception to the automatic stay. A "mere logical relationship" is not enough to bring the mutual debts within the "same transaction." *Id.* Recoupment requires that "both debts ... arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.* (quoting *In re University Med. Ctr.*, 973 F.2d 1065, 1081 (3d Cir.1992)).

■ Assuming arguendo that BNY's obligation to pay the proceeds of the Account arose under the Final Financing Order,[12] the debtors' obligation to pay chargebacks did not. Rather, it arose out of the prepetition Factoring Agreement. To the extent the Final Financing Order directed payment, it commanded the performance of an existing obligation and did not create a new right. The Factoring Agreement continued to measure the obligation to pay chargebacks as well as the breach of that obligation.

In addition, BNY's expansive view of recoupment would frustrate the goal of orderly administration and eviscerate many of the procedural and substantive protections linked with the automatic stay. Many postpetition adequate protection agreements require the debtor to perform its prepetition obligations prospectively. Under BNY's theory, the debtor's failure to perform would allow the secured creditor to bypass a motion for relief from the stay and engage in self help under the guise of recoupment.

Mindful of the need to construe recoupment in bankruptcy narrowly and equitably, I conclude that the parties' respective rights to payment of the chargebacks and the Ac-

11. I do not mean suggest that BNY could impose the freeze if it had the right to recoup. In light of the disposition, it is not necessary to decide this question.

12. Although I have accepted BNY's premise for this motion, the record does not support BNY's contention that the Final Financing Order cre-ates the obligation to pay over the Account. The Letter Agreement is silent on that score. Although the parties have not presented evidence, it may be that the obligation arises from the depositor-bank contract, BNY's regulations and state law.

count proceeds do not arise from a single, integrated transaction, and no right of recoupment exists. Since BNY has failed to demonstrate any other right that it sought to protect through the first administrative freeze, this aspect of its motion for summary judgment must be denied.

### ii. The Second Administrative Freeze

Even BNY does not attempt to justify the second administrative freeze. BNY attributes it to inadvertence. BNY maintains that once the error was brought to its attention, the second freeze was lifted. Assuming that inadvertence or technical noncompliance is a defense to a charge of civil contempt, *see General Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir.1986)("technical or inadvertant [*sic*] violations of the order will not support a finding of civil contempt"); *Energy Capital Co. v. Caribbean Trading,* No. 93 Civ. 8100, 1996 WL 157499 at * 2 (S.D.N.Y. Apr. 4, 1996)(same), BNY is still not entitled to summary judgment.

Initially, BNY did not raise the claim of inadvertence until its reply brief. Up to then, BNY relied on the doctrine of recoupment to justify both freezes. Thus, as with the debtors, I will not consider the argument. In any case, BNY has failed to provide admissible evidence in support of this contention. The sole proof comes from BNY's counsel who states, apparently based on his conversation with Mr. Marsicano, BNY's executive vice president, that "the second administrative freeze was a simple administrative error." (*Declaration of Gilbert Backenroth, Esq. In Further Support of the Plaintiff's Motion for Summary Judgment and in Opposition to Debtor Defendants' Cross–Motion for Partial Summary Judgment,* dated Dec. 3, 1998, at ¶ 4.)

 Counsel obviously lacks personal knowledge of the reason for the second freeze. Moreover, his explanation is hearsay, and "[a] hearsay affidavit is a nullity on a motion for summary judgment" *Schwimmer v. Sony Corp. of Am.,* 637 F.2d 41, 45 n. 9 (2d Cir.1980). BNY has, therefore, also failed to demonstrate its entitlement to summary judgment based on alleged contemptuous violations of the Financing Order resulting from the second freeze. Accordingly, this aspect of its motion for summary judgment must similarly be denied.

### CONCLUSION

The debtors' motion for summary judgment regarding their administrative freeze claims is denied in its entirety. BNY's motion is granted to the extent of dismissing the contempt claims arising from violations of the automatic stay alleged in the Sixth and Seventh Counterclaims. In all other respects, those aspects of BNY's summary judgment motion considered herein are denied. The parties are directed to contact chambers and schedule a conference to discuss further proceedings.

Settle order on notice.